# EXHIBIT A
# TO BRASSEUR DECLARATION

## Exclusive Distribution Agreement Between
## SB Tactical, LLC and Sig Sauer, Inc.

### PREAMBLE

This Business Agreement ("Agreement"), effective March 1, 2013 ("Effective Date") is made by and between Sig Sauer, Inc., a Delaware corporation, having principal place of business at 18 Industrial Drive, Exeter, NH 03833 ("SSI"), and SB Tactical, LLC, a Florida Limited Liability Company, having its principal place of business at 5830 Venetian Blvd. NE, Saint Petersburg, Florida 33703 ("SBT").

### RECITALS

WHEREAS, SBT is in the business of designing, manufacturing and selling firearm stabilizing devices for various models of firearms and wishes to sell such devices to manufacturers of firearms such as SSI (line items on **Exhibit A**);

WHEREAS, SSI wishes to secure a supply of SBT model SB15 stabilizing devices for use with AR-15 type firearms ("Product') and to purchase quantities of such Product from SBT meeting the specifications set forth on **Exhibit A** and for individual sale and Original Equipment Manufacturing installation on SSI's firearms. ("Application");

WHEREAS, SBT shall manufacture and deliver to SSI, its agents, and/or its subsidiaries, Product as set forth in this Agreement, including its Terms and Conditions;

WHEREAS, the parties recognize that the firearm's market is very demanding of quality, timeliness, and price, and that the essence of the relationship between SSI and SBT is flexibility; timely delivery of necessary quantities of qualified, high-yield Products; and low costs;

WHEREAS, if problems should be encountered with respect to any aspect of this Agreement or if the parties should encounter any problems not covered by this Agreement, SSI and SBT shall discuss them in a cooperative and sincere spirit and attempt to arrive at a mutually acceptable solution; and

WHEREAS, this Agreement commences on March 1, 2013 and terminates on August 1, 2016, ("Termination Date") unless terminated earlier;

NOW, THEREFORE, FOR GOOD AND VALUABLE CONSIDERATION, THE RECEIPT AND ADEQUACY OF WHICH IS HEREBY ACKNOWLEDGED, AND IN CONSIDERATION OF THE ABOVE PREMISES AND THE MUTUAL PROMISES CONTAINED IN THIS AGREEMENT, THE PARTIES AGREE AS FOLLOWS:

### TERMS AND CONDITIONS

### ARTICLE I – PRODUCTS

1.1 PRODUCT.

1.1.1 PURCHASE AND SUPPLY. SSI wishes to secure a supply of Product and to purchase quantities of such Product from SBT meeting the respective specifications set forth on **Exhibit A** hereto which, when agreed upon in writing by the parties shall be integrated to this Agreement, and for use in SSI's Application. SBT wishes to supply such Product to SSI on such conditions and on the terms and conditions of this Agreement. Therefore, subject to the terms and conditions of this Agreement, SSI will purchase and SBT will supply Product for the term of this Agreement. SSI's obligation

to purchase Product from SBT is contingent upon SBT's Product meeting agreed upon time to market requirements, Product specifications and functional requirements, price requirements, and the other terms and conditions of this Agreement.

1.1.2 SPECIFICATION. As of the Effective Date, **Exhibit A** may not be attached. The parties will from time to time agree in writing upon specifications for the Product or amendments to agreed-upon specifications and such agreed-upon specifications or amendments shall become part of **Exhibit A** and shall be incorporated into this Agreement when each such written agreement is made.

1.1.3 PACKING. Unless otherwise specified in this Agreement or an Order, all Products are to be packed and identified in accordance with sound commercial practices to:

(i) obtain reasonable transportation rates;

(ii) comply with requirements of common carriers; and

(iii) ensure arrival at the intended destination without damage.

Packages shall be construed for handling with a mechanical device. A complete packing list specifying SSI's applicable purchase order number, quantity of Products shipped, and part number shall be enclosed with all shipments under this Agreement. SBT shall mark each container with necessary shipping information, including the applicable purchase order number, date of shipment, and name and address of SBT and SSI.

1.1.4 FREEDOM OF ACTION. Except as otherwise provided herein, nothing in this Agreement shall prevent SBT from engaging in similar business with other persons, including, without limit, competitors of the other party, provided that the confidentiality terms of this Agreement are not breached.

1.1.5 SOLE SOURCE. SBT will use due care to provide an uninterrupted supply of Product.

1.2 WARRANTY. Each of SBT's warranties made hereunder is materially relied upon by SSI in entering into this Agreement or any Order.

1.2.1 AUTHORITY WARRANTY. Each party represents and warrants that all corporate action necessary for the authorization, execution and delivery of this Agreement by such party and the performance of its obligations under this Agreement has been taken. Further, each party represents and warrants that neither the execution of this Agreement nor any performance of this Agreement shall conflict with or be prohibited by any interest, agreement, obligation, contract, order, law, regulation, or duty, oral or written, to which it is a party by which it is bound.

1.2.2 PRODUCT WARRANTY. SBT warrants the Product, within eighteen (18 months) after shipment, to:

(i) have a clear title, free of all security interests, encumbrances, or liens;

(ii) be new;

(iii) be free from defects in workmanship and materials;

(iv) conform to applicable agreed upon specifications, drawings, or other descriptions given, including those set forth in this Agreement;

The above is the Product Warranty ("Product Warranty"). A unit of Product which meets all of the standards of the Product Warranty shall be a Conforming Product ("Conforming Product"). Replaced Product shall be subject to the provisions of this warranty to the same extent as the original Product except that the warranty period shall run from the last delivery date of the Replaced Product.

1.2.3 SCOPE OF WARRANTY. The above warranties shall run to SSI.

(i) Warranty Disclaimer. EXCEPT FOR THE WARRANTIES SET FORTH ABOVE, SBT GRANTS NO OTHER WARRANTIES, EITHER EXPRESS OR IMPLIED, FOR THE PRODUCT, AND DISCLAIMS ALL IMPLIED WARRANTIES OF MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE.

1.3 REMEDIES. If SBT breaches its warranties as contained herein, SBT's sole, maximum liability shall be (by mutual agreement of the parties) to repair, replace, or credit SSI's account for any goods which are returned by SSI during the warranty period set forth above, provided that (a) SBT is promptly notified in writing upon discovery by SSI that the Products failed to conform to this contract with a reasonably detailed explanation of any alleged deficiencies, (b) the Products are returned to SBT, F.O.B. SSI, and (c) SBT's examination of the goods shall disclose that such alleged deficiencies actually exist and were not caused by accident, misuse, neglect, alteration, improper installation, unauthorized repair or improper testing. If the Products were improperly sent to SBT, SSI shall reimburse SBT for the transportation charges paid by SBT for the Products. If SBT elects to repair or replace the goods, SBT shall have a reasonable time to make the repairs or replacement. Such repair, replacement or credit shall constitute fulfillment of all liability of SBT to SSI whether based in contract, tort, indemnity, and statutory provision or otherwise.

1.4 PROMOTION: Any and all advertisements and promotional media by SSI describing or depicting the Product shall be submitted for review by SBT for prior written approval. Approval shall be granted to those submissions that are limited solely to the depiction and/or description of the intended use of the Product, which is to assist a shooter in holding a firearm with one hand, with all straps properly placed and secured.

1.5 EXCLUSIVITY: SBT agrees to sell solely and exclusively to and SSI agrees to purchase the Product specified on **Exhibit A** with such additions as the Parties may agree to from time to time in advance in writing (collectively, the "Products" and individually, a "Product"), in such combinations and quantities as shall be specified by SSI in written purchase Orders delivered to and accepted by SBT from time to time. In the event of a conflict between or inconsistency with the terms of this Agreement and the Order, the terms of this Agreement shall control.

SBT hereby appoints SSI as its exclusive worldwide distributor of the Product during the term of this Agreement. SSI accepts this appointment. SBT shall not directly or indirectly sell or offer to sell any of the Products to any third party. In the event SBT receives requests for information relating to, or purchase orders for, Products from customers or potential customers within the Territory, SBT shall promptly forward such requests or orders to SSI. SSI shall have the right to appoint sub-distributors, for a time period not exceeding the remainder of the term of this Agreement, at its discretion.

1.6  ORDERING

Initial Purchase: SSI shall purchase ten-thousand (10,000) Product units as its first order for delivery in the first four months of this agreement, to be delivered and invoiced in increments of 5,000 Product units, with the first five-thousand (5,000) Product units to be delivered by May 1st, 2013, and the second five thousand (5,000) product units to be delivery by June 1, 2013.

Additional Purchases: SSI shall issue separate blanket purchase orders for additional purchases.  Blanket purchase orders are ordering agreements against which individual orders may be placed within a specific period of time to allow purchases to respond to market demand.  Blanket orders shall issue for a target quantity of forty thousand (40,000) units in months five through sixteen (5–16), fifty thousand (50,000) units in months seventeen through twenty-eight (17-28), and sixty thousand (60,000) units in months twenty nine to forty (29-40).

SSI agrees to use best efforts to drive demand that supports releasing individual orders that total the target quantities.  If at the end of each blanket order period (months 16, 28, and 40 after the effective date) SSI has not ordered 80% of the target quantities for that period (Minimum Purchase Requirement) SBT may, in its sole discretion, terminate SSI's exclusive market position and offer the Product for sale via other distribution channels.

Contingent Purchase Requirement: Upon the passage of any law, federal or state, that impedes the sale of the Product or the sale of the firearms for which the Product is designed such that it materially affects the ability of SSI to meet the Minimum Purchase Requirements, the parties agree to terminate this Agreement.  Outstanding undelivered orders between SBT and SSI shall be terminated at no cost, and the cost of any inventory held by SSI and not sold within 3 months of the termination shall be equally shared by SSI and SBT, however SBT's liability shall not exceed $100,000.

## ARTICLE II – PROCEDURES

### 2.1 QUALIFICATIONS.

2.1.1  QUALIFICATIONS. The respective obligations of the parties pursuant to this Agreement shall be subject to the successful qualification of SBT's Product and its manufacturing process in SSI's Application, as SSI deems necessary. SSI and SBT shall cooperate to set up the necessary processes and procedures to accomplish and facilitate such qualification. SBT's Product must complete qualification by SSI in order to be tendered under this Agreement, and must consistently perform according to the applicable agreed upon specification. SSI will use its reasonable commercial efforts to qualify and utilize SBT's Product in new or additional Applications.

2.1.2  CHANGES. SBT shall provide SSI ninety (90) days' notice in writing of any changes in Product design, material, production process, or plant location which affect the form, fit or function of the product in order to allow it to requalify the Product, before any Product is manufactured by the new design, material, process or in the new location and sold to SSI.

### 2.2 TOOLING.

Unless otherwise specified in this Agreement, all tooling and/or all other articles required for SBT's performance under this Agreement shall be furnished by SBT, maintained in good condition and replaced when necessary at SBT's expense. If SSI agrees to pay SBT for special tooling or other items either separately or as a stated part of the unit

price of Products, title to same shall be and remain in SSI upon payment, and that specific tooling shall be treated as property of SSI, furnished by SSI to SBT.

2.3 FORECASTS.

SSI shall forecast its requirements for Products to SBT, as provided below, on a non-binding basis, and SBT shall use its reasonable commercial efforts to maintain the ability to supply SSI's requirements from SBT. Notwithstanding the above, nothing in this Agreement shall be construed as an obligation for SSI to purchase any Products, or for SBT to supply any Products, except as expressly state herein and as provided in any Order issued by SSI and accepted by SBT.

2.3.1 FORECASTS. During the term of this Agreement, SSI shall provide SBT, on a monthly basis, with a nine (9) month rolling forecast setting forth its estimated requirements and shall provide Orders based on its requirements for the first three (3) months of the forecast. Product lead-times will [be] as set forth in **Exhibit A** or as later mutually agreed by the parties. SSI's forecast is provided solely for SBT's convenience and for its planning purposes; no forecast shall be construed as an authorization by SSI to order any materials for, or to allocate any labor or equipment for the manufacture of the Product nor impose on SBT any obligation to supply Product. SSI will not be responsible for any of SBT's cost or expense for materials, Product, labor, or other commitments or expenses, other than as authorized in herein and as provided in Orders.

2.4 ORDERS.

2.4.1 ORDERS. All purchases and sales shall be initiated by SSI's issuance of written purchase orders sent via email, airmail, facsimile or courier ("Order"). Such Orders shall reference this Agreement and state the unit quantities, unit descriptions, price, requested delivery dates and shipment instructions. The receipt by SBT of an Order shall be indicated by written acknowledgment within five (5) work days. SBT shall accept all Orders which conform to the requirements of this Agreement and which, cumulatively, do not for any quarter exceed SSI's most recent forecast by more than thirty percent (30%). Acceptance of Orders in excess of such limit shall be subject to negotiation and agreement by the parties. Nothing in this Agreement shall be construed as an obligation for SSI to purchase any Products, except as expressly provided in the herein and in any Order issued by SSI. No modification of this Agreement will be effective unless made in writing signed by both parties, which expressly intends to modify this Agreement. The preprinted terms and conditions of purchase orders, acceptances, confirmations and similar business documents shall have no effect as amendments of, objections to, or modifications of this Agreement.

2.4.2 END OF TERM. In the event of the expiration or termination of this Agreement, any Orders placed and accepted before such expiration or termination shall be completed according to the terms of this Agreement.

2.5 INSPECTION.

SSI and SBT shall cooperate to inspect Products, and nothing in this section shall limit SSI's other rights and remedies.

2.5.1 INSPECTION BY SSI. SSI may test each lot or Order of Product to ensure that the Products meet the agreed upon specifications and acceptance criteria, and SBT shall not ship any Products that do not Conform. All Product (including raw materials, components, subassemblies, and end products) may be inspected and tested by SSI or SSI's agent at all reasonable times and places before, during and after manufacture or shipment. In no event shall SSI be liable for any reduction in value of samples used in

connection with any inspection or test. If any inspection or test is to be made on SBT's premises, SSI shall provide at least ten (10) work days notice thereof and SBT shall, without additional charge, provide reasonable facilities and assistance during normal business hours for the safety and convenience of inspectors in such manner as not unduly to delay the work. In the event of a SBT device epidemic failure (as defined below), SSI has the right to inspect SBT's facilities where the product is manufactured with two working days notice. Inspection of Products at SBT's facility shall be without prejudice to SSI's right to inspect and reject such Products upon delivery to SSI's facility. Where applicable, SSI may, at its option, inspect all products or inspect a statistical sample selected from each lot, and Product, lots or Orders may be inspected more than once.

2.5.2 INSPECTION BY SBT. SBT will ensure that all Product are tested in accordance with the agreed upon specifications and requirements, as may be amended from time to time. SBT will provide only those Products conforming to the agreed upon specifications and requirements, unless SBT has obtained prior written approval from SSI for any deviation from such specifications.

2.5.3 IN CASE OF FAILURE OF INSPECTION. If the above inspection or testing detects Products which do not conform to the agreed upon specifications or the requirements of this Agreement, SSI and SBT will closely cooperate to identify and find a way to correct the causes of the problem(s). SSI may refuse to accept Products which do not conform. SSI may reject entire lots or Orders if lot acceptance criteria established in the specifications are not fulfilled; provided that any canceled portion of an Order shall nevertheless be purchased for purposes of determining SSI's Minimum Purchase Requirements. The rejected Product may, at SSI's discretion, be returned to SBT at SBT's expense in accordance with Section 1.3, Remedies. SSI may immediately stop future shipments of Product until the cause(s) for non-conformity, as mutually determined by parties, has been corrected. SSI will use its reasonable commercial efforts to assist SBT in identifying the cause(s) for rejection.

2.6 SHIPPING.

2.6.1 SHIPPING. SBT shall use the freight carrier designated by SSI in its order.

2.6.2 TIMELINESS. SBT shall use its reasonable efforts to meet a 100% on time delivery commitment. If SBT's performance falls below 100% on-time deliveries, then SBT shall implement a corrective action plan acceptable to SSI which brings the deliveries back to 100% on-time. If SBT is unable to deliver any Product on schedule, SBT shall promptly notify SSI giving a new delivery date, and SSI may:

(i) accept the new delivery date; or

(ii) reschedule the delivery by means of a Change Order, or

(iii) cancel the delayed portion of the Order if SBT fails to meet the originally promised delivery date plus 30 days; provided that any cancelled portion of an Order shall nevertheless be counted as purchased for purposes of determining SSI's Minimum Purchase Requirements.

2.8 ACCEPTANCE.

If, after 10 days from the date of receipt by SSI, SSI has not rejected the Product, it will be deemed to have been accepted by SSI. SSI also may accept the Product by written notice. The act of inspection or payment by SSI for the Product will not be construed as

SSI's acceptance of any Product. Acceptance of any Product shall not affect the Product warranty or any related remedy.

## 2.9 RETURNS.

Returns of product to SBT under warranty shall be in accordance with Section 1.3, Remedies. If SBT requests, SSI will apply SBT's Return Materials Authorization (RMA) or similar number to the returned Products and/or related documentation, provided, however, that SBT must supply such RMA number to SSI on a timely basis.

## 2.10 EPIDEMICS.

The procedures and remedies for epidemics are in addition to all other of SSI's rights and remedies available under this Agreement.

2.10.1 EPIDEMIC DEFINED. An epidemic failure shall occur when (a) one percent (1%) of the Product shall be non-conforming over a period of thirty (30) days.

2.10.2 EFFECT OF EPIDEMIC. In the event that the Products supplied by SBT to SSI should develop any epidemic failure, the parties will meet in order to work out technical methods to remedy the problem. In such event, shipment of undelivered Products related to the Order or Orders will be postponed, at SSI's written request, until the cause of the epidemic has been corrected. In case upon the expiration of 30 (thirty) days from the date of SSI's notice regarding the epidemic, SBT has not yet remedied the same, then SSI shall be entitled to cancel pending Orders without any liability for such cancellation and without prejudice to SSI's rights for damages or any other remedy as may specifically be provided for in this agreement. In the event that a remedy has been found, all Product units subsequently delivered to SSI shall incorporate the modification remedying the defect. Product units previously delivered to SSI will be remedied in accordance with Section 1.3, Remedies.

## 2.11 INVOICING.

SBT will issue the invoices for the Products and will date them with a date equal or subsequent to shipment date. Invoices shall reference purchase order number, item number and description of Products, unit price of Products, and total amounts due.

## 2.12 PAYMENT.

2.12.1 TERMS. Invoices shall be due and payable within 30 days after the date of invoice. SSI's payment advice shall reference SBT's invoice number(s) and date(s).

2.12.2 CURRENCY. Unless expressly provided to the contrary, all amounts stated in this Agreement and all sums payable under this Agreement shall be denominated in United States Dollars and all payments made under this Agreement shall be made by wire transfer, cashier's check, or other ready funds (as mutually agreed) in United States Dollars to payee's account at payee's designated United States bank.

2.12.3 DISPUTES. SSI shall have 30 days after the invoice date to contest in good faith the amounts and items charged.

2.12.4 BILLS. SBT's bills shall list all open invoices, invoice dates, and amounts unpaid; payments received, and credits issued.

2.12.5 PAYMENT APPLICATIONS. Payments shall be applied to open invoices according to SSI's payment advice, but, in the event the payment advice does not specify invoices, then payments shall be applied to oldest items first.

2.13 ORDER CHANGES.

No Order shall be deemed or construed to be modified, amended, rescinded, canceled, or waived in whole or in part, except by a written Change Order signed by all Parties.

2.14 ENGINEERING CHANGES.

SBT shall not make any changes in the form, fit, or function of the Product or any process by which they are produced except as set forth in this section.

2.14.1 DEFINITION. Engineering change(s) are those changes, made to the Products, or, which, if made, could materially affect the qualification, schedule, performance, reliability, availability, serviceability, appearance, dimensions, tolerances, safety or costs.

2.14.2 SBT CHANGES. SBT will notify SSI of any engineering changes proposed to be made by SBT to Products or any process by which they are produced.

2.14.3 UNFORESEEN CHANGES. In the event of a serious and unforeseen safety or technical problem with the Products provided under this Agreement, an emergency engineering change may be required. Such problem may or may not result in the Products failing to meet the applicable Specifications. SSI and SBT shall mutually agree as to the resolution of such problems.

2.14.4 IMPACTS. In the event an engineering change is implemented, the applicable Specifications will be amended as required and the Product will be subject to requalification. In the event any SSI required engineering change directly causes a negative financial impact to SBT due to incorporation of such change into a Product, the parties agree to promptly meet to discuss fair allocation of such financial impact. SBT agrees to use its reasonable efforts to notify SSI of such financial impact prior to incorporation of such engineering change, and in any event, notify SSI as soon as SBT becomes aware of such impact. SSI will determine whether the Product must be requalified in whole or in part as a result of any engineering change.

2.15 SHORTAGES.

SBT agrees that in the event of a shortage of capacity or material that will affect the supply of the Product, SSI's Order(s), subject to normal lead-time requirements, shall always be filled according to an allocation plan at least as favorable as those provided to all other SBT customers with similar or lesser quantity forecasts and Orders, purchasing under similar conditions. SBT shall provide SSI with as much notice as possible if it anticipates or has reason to believe that SBT's output of the Product will not be sufficient to meet all of SSI's requirements for any period.

## ARTICLE III – INTELLECTUAL PROPERTY

3.1 CONFIDENTIALITY.

3.1.1 CONFIDENTIAL INFORMATION. "Confidential Information" shall mean any information disclosed by one party to the other pursuant to this Agreement which is in written, graphic, machine readable or other tangible form and is marked "Confidential", "Proprietary" or in some other manner to indicate its confidential nature.

Confidential Information may also include oral information disclosed by one party to the other pursuant to this Agreement, provided that such information is designated as confidential at the time of disclosure and reduced to a written summary by the disclosing party, within thirty (30) days after its oral disclosure, which is marked in a manner to indicate its confidential nature and delivered to the receiving party. Each party shall treat as confidential all Confidential Information of the other party, shall not use such Confidential Information except as expressly set forth in this Agreement or otherwise authorized in writing, shall implement reasonable procedures to prohibit the disclosure, unauthorized duplication, misuse or removal of the other party's Confidential Information and shall not disclose such Confidential Information to any third person except as may be necessary and required in connection with the rights and obligations of such party under this Agreement, and subject to confidentiality obligations at least as protective as those set forth in this Agreement. Each of the parties shall use the same procedures and degree of care which its uses to prevent the disclosure of its own confidential information of like importance to prevent the disclosure or misuse of Confidential Information disclosed to it by the other party under this Agreement, but in no event less than reasonable care. The party disclosing an item of Confidential Information shall be the Discloser ("Discloser"), and the party receiving an item of Confidential Information shall be the Receiver ("Receiver"). Notwithstanding the above, neither party shall have liability to the other with regard to any Confidential Information of the other which:

(i) was generally known and available in the public domain at the time it was disclosed or becomes generally known and available in the public domain through no fault of Receiver;

(ii) was known to Receiver at the time of disclosure;

(iii) is disclosed with the prior written approval of Discloser;

(iv) was independently developed by Receiver without any use of the Confidential Information;

(v) becomes known to Receiver from a source other than the Discloser without breach of this Agreement by Receiver and otherwise not in violation of the Discloser's rights;

(vi) is disclosed pursuant to the order or requirement of a court, administrative agency, or other governmental body; provided that Receiver shall provide prompt, advance notice to Discloser;

(vii) is disclosed by Discloser to a third party without obligation of confidentiality.

3.1.2 USE OF CONFIDENTIAL INFORMATION. Notwithstanding any termination, expiration, or cancellation under this Agreement, Receiver will not use the Confidential Information for a period of five (5) years, for any other purpose than pursuing the transactions and relationship contemplated by this Agreement.

3.1.3 TERM OF NONDISCLOSURE OBLIGATION. Notwithstanding the term of this Agreement, the obligations of SBT and SSI under this Agreement with respect to any Confidential Information shall continue for a period of five (5) years after the date of disclosure of the Confidential Information.

3.1.4 EXPORT CONTROLS. Recipient agrees that it will not knowingly

(i) export or re-export, directly or indirectly, any technical data (as defined by the U.S. Export Administration and International Traffic in Arms Regulations) received under this Agreement to,

(ii) disclose such technical data for use in, or

(iii) export or re-export, directly or indirectly, as any direct product of such technical data to, any destination to which such export or re-export is restricted or prohibited by U.S. law, without obtaining prior authorization from the U.S. Department of Commerce or State.

## ARTICLE IV – LIABILITIES

4.1 COMPLIANCE WITH LAWS. Each party shall, in the performance of work or services under this Agreement, fully comply with all applicable national, state, and local laws, rules, regulations, and ordinances.

4.2 INFRINGEMENT INDEMNITY.

4.2.1 SBT shall defend any proceeding brought against SSI insofar as the proceeding is based on a claim that any Products manufactured and supplied by SBT to SSI directly infringes any duly issued United States patent, copyright or trademark and SBT shall pay all damages and costs finally awarded therein against SSI, provided that SBT is promptly informed and furnished a copy of each communication, notice or other action relating to the alleged infringement and is given authority, information and assistance (at SBT's expense) necessary to defend or settle the proceeding. SBT shall not be obligated to defend or be liable for costs and damages if the infringement arises out of compliance with SSI's specifications, or from a combination with, an addition to, or a modification of the Products after delivery by SBT, or from use of the Products, or any part thereof, in the practice of a process. Subject to Section 4.2.2 below, SBT's obligations hereunder shall not apply to any infringement occurring after SSI has received notice of such proceeding or other communication alleging the infringement unless SBT has given written permission for such continuing infringement.

4.2.2 If the Products manufactured and supplied by SBT to SSI shall be held to infringe any United States patent, copyright or trademark, and SSI shall be enjoined from using same, or if SBT discontinues shipment pursuant to Section 4.2.3 below, SBT will, at its option and at its expense:

(a) procure for SSI the right to use such Products free of any liability for patent infringement, or

(b) replace such Products with a noninfringing substitute otherwise complying substantially with all requirements of this Agreement, or

(c) refund the purchase price and the transportation costs of such Products.

4.2.4 THE SALE BY SBT OF THE PRODUCTS ORDERED HEREUNDER DOES NOT GRANT TO, CONVEY OR CONFER UPON SSI OR SSI'S CUSTOMERS, OR UPON ANYONE CLAIMING UNDER SSI A LICENSE, EXPRESS OR IMPLIED, UNDER ANY PATENT RIGHT, COPYRIGHT, MASK WORK RIGHT OR OTHER INTELLECTUAL PROPERTY RIGHT OF SBT COVERING OR RELATING TO ANY COMBINATION, MACHINE OR PROCESS IN WHICH SAID PRODUCTS MIGHT BE OR ARE USED. THE FOREGOING STATES THE SOLE LIABILITY OF THE PARTIES FOR INTELLECTUAL PROPERTY RIGHTS INFRINGEMENT

AND IS IN LIEU OF ALL WARRANTIES, EXPRESS, IMPLIED OR STATUTORY, IN REGARD THERETO.

4.3 INSURANCE. SBT shall maintain commercial general liability insurance in appropriate amounts and shall furnish proof of such insurance to SSI upon request.

4.4 LIMITATION OF LIABILITY. IN NO EVENT SHALL EITHER PARTY BE LIABLE FOR ANY SPECIAL, CONSEQUENTIAL, INDIRECT, OR INCIDENTAL DAMAGES, HOWEVER CAUSED, ON ANY THEORY OF LIABILITY AND WHETHER OR NOT SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES, ARISING IN ANY WAY OUT OF THIS AGREEMENT OR ANY AGREEMENT, UNDERTAKING, OR PERFORMANCE THAT MAY BE PROMISED, PERFORMED, OR EXECUTED TO IMPLEMENT THIS AGREEMENT.

## ARTICLE V – DISPUTE RESOLUTION

5.1 ESCALATION. The parties agree that any material dispute between the parties relating to this Agreement will be submitted to a panel of two senior executives of SSI and SBT. Either party may initiate this proceeding by notifying the other party pursuant to the notice provisions of this Agreement. Within five (5) days from the date of receipt of the notice, the parties' executives shall confer (via telephone or in person) in an effort to resolve such dispute. Each party's executives shall be identified by notice to the other party, and may be changed at any time by notice.

5.2 CHOICE OF LAW. This Agreement and any agreement, undertaking, or performance that may be promised, performed, or executed to implement this Agreement shall be governed by and construed under the laws of the State of Florida.

5.3 JURISDICTION. The courts of the State of Florida are to have jurisdiction to settle any dispute arising out of or in connection with this Agreement.

5.4 MEDIATION AND ARBITRATION. In the event a dispute arises out of or in connection with this Agreement, the Parties will attempt to resolve the dispute through friendly consultation. If the dispute is not resolved within a reasonable period then any or all outstanding issues may be submitted to mediation in accordance with any statutory rules of mediation. If mediation is not successful in resolving the entire dispute or is unavailable, any outstanding issues will be submitted to final and binding arbitration in accordance with the laws of the State of Florida. The arbitrator's award will be final, and judgment may be entered upon it by any court having jurisdiction within the State of Florida.

5.5 ATTORNEYS FEES. In the event of litigation relating to the subject matter of this Agreement, the non-prevailing party shall reimburse the prevailing party for all reasonable attorney fees and costs resulting therefrom.

5.6 LIMIT OF TIME TO BRING ACTION. No actions, regardless of form, arising out of this Agreement, may be brought by either party more than two (2) years after such actions arose, or in the case of nonpayment, more than two (2) years from the date the last payment was due.

## ARTICLE VI – GENERAL

6.1 TERM AND TERMINATION.

6.1.1 TERM. This Agreement shall become effective on the Effective Date and shall remain in force until the Termination Date, when this Agreement shall terminate.

6.1.2 RENEWAL. The parties may agree in writing to extend this Agreement for one or more terms of one (1) year.

6.1.3 TERMINATION FOR CAUSE. This Agreement shall be terminated for cause:

(i) If either party materially defaults in the performance of any provision of this Agreement, then the non-defaulting party may give written notice to the defaulting party that if the default is not cured within thirty (30) calendar days, the Agreement will be terminated at the end of that period and such termination shall not prejudice or limit either party's remedies; or

(ii) If either party violates any intellectual property, confidentiality, or license provision of this Agreement, then the non-defaulting party may give written notice to the defaulting party of such violation and of immediate termination and the Agreement will be terminated when such notice is given and such termination shall not prejudice or limit either party's remedies; or

(iii) Upon:

(a) the institution by or against either party of insolvency, receivership or bankruptcy proceedings or any other proceedings for the settlement of its debts; or

(b) either party's making an assignment for the benefit of creditors; or

(c) either party's dissolution, this Agreement shall terminate immediately without notice and shall be deemed to have been terminated by the party not so affected and such termination shall not prejudice or limit either party's remedies.

6.1.5 DUTIES UPON TERMINATION. Upon any termination or expiration of this Agreement:

(i) neither party shall retain any copies of any Confidential information which may have been entrusted to; and

(ii) all pending purchase orders shall be completed in accordance with the terms contained herein.

6.1.6 SURVIVAL. The terms of this Agreement which by their nature may survive the termination or expiration of this Agreement shall survive the termination or expiration of this Agreement.

6.2 GENERAL.

6.2.1 ASSIGNMENT. Neither party shall transfer or assign its rights under this Agreement directly or indirectly including without limit in the cases of merger, acquisition of greater than fifty percent (50%) ownership or control interest in such party by any party, or sale of its assets, without the prior written consent of the other party, which consent shall not be unreasonably withheld. Subject to the above sentence, this Agreement shall be binding upon and inure to the benefit of the parties, their successors and assigns. Any purported assignment of this Agreement by a party without the prior written consent of the other party shall be void.

6.2.2 CONSENTS. No consent required to be given under this Agreement shall be unreasonably withheld.

6.2.3 COUNTERPARTS. This Agreement shall be prepared in two identical and original counterparts and both of which together shall be one and the same instrument and either of which may be used for purposes of proof.

6.2.4 CUMULATION OF REMEDIES. All remedies available to either party under this Agreement are cumulative and may be exercised concurrently or separately, and the exercise of any one remedy shall not be deemed an election of such remedy to the exclusion of other remedies.

6.2.5 INDEPENDENT PARTIES. Persons furnished by each party shall be solely the employees or agent of such party and shall be under the sole and exclusive direction and control of the furnishing party. They shall not be considered employees of the other party for any purpose. Each party shall remain an independent contractor and shall be responsible for compliance with all laws, rules and regulations involving, but not limited to, employment of labor, hours of labor, health and safety, working conditions and payment of wages. Each party shall also be solely responsible for payment of taxes, including federal, state and municipal taxes, chargeable or assessed with respect to its employees, such as social security, unemployment, worker's compensation, liability insurance and federal and state withholding. Neither party nor its employees, officers, directors, or agents shall hold itself out as the agent, employee, legal partner, or joint venturer of the party, and shall make no commitment or engagement on the account of or on behalf of the other party.

6.2.6 FORCE MAJEURE. Nonperformance of either party shall be excused to the extent that performance is rendered impossible by strike, fire, flood, governmental acts, orders or restrictions, or any other reason where failure to perform is beyond the control and not caused by the negligence of the nonperforming party. In the event of any delay caused by such contingency, the delayed party may defer any performance or delivery prevented by the force majeure condition for a period equal to the time lost by reason of such delay, provided, however, that the delayed party promptly commences and reasonably and diligently pursues actions to cure or circumvent such cause. Whenever any cause delays or threatens to delay the timely performance of this Agreement, obligated Party shall immediately notify the other Party of all relevant information with respect to such cause.

6.2.7 HEADINGS. The descriptive headings of the several Articles and Sections of this Agreement are inserted for convenience only and do not constitute a part of this Agreement and shall not affect the interpretation of this Agreement.

6.2.8 JOINT WORK PRODUCT. The parties further acknowledge that they have thoroughly reviewed this Agreement and bargained over its terms and that for convenience, SBT has written the terms of this Agreement. Accordingly, this Agreement shall be construed without regard to the party or parties for its preparation and shall be deemed to have been prepared jointly by the parties.

6.2.9 NOTICES. Any notice required or permitted to be given under this Agreement shall be in writing and shall be deemed to be sufficiently given if delivered by hand or if sent by courier with a receipt requested or by registered air mail, postage prepaid, addressed to SSI or to SBT, as the case may be, at the addresses first set forth above or to such other address as may be furnished for such purpose by notice duly given under this Agreement. Such notice shall be deemed to have been given when delivered by hand or five (5) days after deposit with the courier or mail service. Any party may change its address for such communications by giving such notice to the other party in conformance with this section.

6.2.10 SEVERANCE. If any provision of this Agreement is held to be invalid by a court of competent jurisdiction, then the remaining provisions shall nevertheless remain in full force and effect. The parties agree to renegotiate any term held invalid and to be bound by the mutually agreed substitute provisions.

6.2.11 WAIVER. The failure of any party to this Agreement at any time or times to require performance of any provision of this Agreement shall in no manner affect such party's available remedies or right at a later time to enforce the same. No waiver by any party of any condition, or of the breach of any term, covenant, representation or warranty contained in this Agreement, whether by conduct or otherwise (in any one or more instances) shall be deemed to be or construed as a further or continuing waiver of any such condition or breach or of any remedy or as a waiver of any other condition or as a breach of any other term, covenant, representation or warranty of this Agreement.

## ARTICLE VII – EXECUTION

7.1 ENTIRE AGREEMENT. The terms and conditions of this Agreement are the entire agreement between the parties and supersede all previous agreements, proposals, and understandings, whether oral or written, between the parties with respect to the subject matter of this Agreement (except for confidentiality agreements governing the exchange of information prior to the Effective Date which shall continue to govern periods prior to the Effective Date) and no agreement or understanding varying or extending the same shall be binding upon either party unless in a written document signed by both parties. This Agreement shall supersede all inconsistent or additional terms contained in any future purchase orders, sale acknowledgments or other similar documents delivered by the parties.

7.2 EXECUTION. This Agreement shall not be effective until it has been executed by all Parties.

7.3 ELECTRONIC EXECUTION. To expedite the process of entering into this Agreement, the parties acknowledge that Transmitted Copies of this Agreement shall be equivalent to original documents until such time as original documents are completely executed, produced, and delivered, and in the event of the use of Transmitted Copies, each party shall use its reasonable efforts, at its own to expense, to execute, produce, and deliver original copies. "Transmitted Copies" shall mean copies which are reproduced or transmitted via photocopy, facsimile, or other process of complete and accurate reproduction and transmission.

In witness whereof, the parties have executed this Agreement as of the Effective Date.

SIG SAUER, INC.

By: _____
Steven Shawver
Vice President and General Counsel

SB TACTICAL, LLC

By: _____
Alessandro Bosco,
Manager,

## EXHIBIT A

### PRODUCTS AND PRICING

| Item | SSI's Per Unit Cost | Initial Minimum Purchase Requirement to begin delivery by May 1, 2013 | Total Minimum Purchase Required to maintain exclusivity | Lead Time |
|------|--------|------|------|------|
| SB15 | $40.00 | 10,000 (Delivered in 5,000 Product unit increments.) | 80% of 160,000 Units | 4 Weeks |

## PRODUCT SPECIFICATION AND QUALIFICATION REQUIREMENTS

The product will conform to specification requirements as agreed upon the conclusion of first article review and quality requirements as delineated by SIG.

## PACKAGING REQUIREMENTS

Product may be bulk packaged or individually packaged in accordance with SIG's packaging requirements.

SIG will identify the quantity of the product to be delivered in bulk or individual packaging with each individual purchase order.

# EXHIBIT B
# TO BRASSEUR DECLARATION

Distribution Agreement

This Distribution Agreement (this "Agreement") effective June 1, 2016 ("Effective Date") is by and between SIG SAUER, Inc., a Delaware corporation, having its principal place of business at 72 Pease Boulevard, Newington, New Hampshire 03801 ("SIG") and SB Tactical, LLC, a Florida Limited Liability Corporation, having its principal place of business at 1225 Darlington Oak Circle NE Saint Petersburg, Florida, 33703 ("SBT"), each a "Party" and together the "Parties".

WHEREAS, SBT is in the business of designing, manufacturing and selling firearm stabilizing devices and other firearms accessories;

WHEREAS, SIG is in the business of designing, manufacturing, marketing and selling firearms and other related accessories;

WHEREAS, SBT desires to appoint SIG as the exclusive distributor on all SIG branded products as defined below and subject to the terms and conditions of this Agreement.

WHEREAS, SIG desires to purchase the SIG branded SBT Products from SBT and resell the Products for individual sale and Original Equipment Manufacturing (OEM) installation on SIG's firearms, subject to the terms and conditions of this Agreement; and

NOW, THEREFORE, in consideration of the mutual covenants, terms and conditions set out herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto agree as follows:

1. **Appointment**
   1.1. Exclusive Distributor. SBT appoints SIG as the exclusive distributor of SIG branded SBT Products and SBT branded Products during the term and in accordance with the terms and conditions of this Agreement. SBT shall offer SIG the right of first refusal to act as the exclusive distributor for any new Product developed by SBT that compliments SIG's current product offerings, subject to a product-specific exclusivity agreement. SIG shall have thirty (30) days from the first notice of a new product from SBT to decide to distribute the product. SBT may not sell or offer to sell the Products to any other third party if SIG decides to distribute the Product as a SIG branded exclusive Product. SIG will exclusively handle distribution of SIG branded SBT Product and SBT branded Product through SIG's distribution channels. If SIG decides not to distribute the Product, SBT may sell or otherwise distribute the Product. SBT will handle OEM and consumer direct sale on all SBT branded product. The term of exclusivity will be determined by mutual agreement of the Parties when SIG decides to distribute the Product; however, the term of exclusivity will not be less than one (1) year.
   1.2. Subdistributors. SIG may appoint subdistributors as SIG determines is appropriate for the effective distribution of the Products.

2. **Products**
   2.1. Purchase of Products. SBT shall make available and sell the SIG branded SBT Products to SIG. SIG is not required to purchase any minimum amount outside of minimums agreed to in order to secure exclusivity for a specific product.
   2.2. Pricing. Product pricing will be set up with price breaks for each item independently. Each product price will be agreed upon as individual products as amendments to this Agreement.
   2.3. SIG Branded Product Pricing. Pricing of each Product will be determined by mutual agreement of the Parties.
   2.4. SBT Branded Product Pricing. SIG will be offered preferential OEM pricing on non-exclusive items of 10%.
   2.5. MAP. SBT Branded Product has MAP which will be determined by SBT and enforced by both SBT and SIG. SIG Branded Product does not have MAP and is left to the discretion of SIG to set and maintain pricing.
   2.6. Changes in Products.
      2.6.1. Availability. SBT shall notify SIG ninety (90) days prior to discontinuing or replacing a Product. If commercially reasonable, SBT shall honor any orders made by SIG customers prior to the discontinuation notice. Upon receiving notice, SIG may return any remaining discontinued Product in its inventory.
      2.6.2. Material. SBT shall notify SIG ninety (90) days prior to any changes in the product design, material, production process, or plant location which may affect the form, fit or function of a specific Product.

3. **Procedures**
   3.1. Ordering
      3.1.1. Purchase Orders. SIG shall issue Purchase Orders to SBT for SIG branded SBT Product via email, airmail, facsimile, or electronic data interchange. Purchase Orders will reference this Agreement, and state the unit quantities, descriptions, price, requested delivery dates, and shipment instructions. Preprinted terms and conditions on Purchase Orders will not have the effect of a modification or amendment of this Agreement.
      3.1.2. Acceptance of Purchase Order. SBT shall confirm to SIG the receipt of each Purchase Order within 5 business days through the same medium the Purchase Order was received. If SBT does not confirm receipt with 5 days or commences performance of the Purchase Order, SBT will have accepted the Purchase Order.
      3.1.3. Forecasts. Each quarter, SIG shall provide SBT with a nine month rolling forecast of SIG's estimated order requirements. Such forecasts are for convenience purposes only, and are not binding orders by SIG. Acceptance of Purchase Orders that exceed

30% of the prior month's forecast are subject to negotiation and agreement by the Parties.

3.2. Inventory

    3.2.1.  SIG Branded Products. SIG will purchase and store inventory of SIG branded Product.

    3.2.2.  SBT Products. All other SBT Products that are not SIG Branded Products will be stored by SIG on a consignment basis only at inventory levels determined by SIG Product Management.

3.3. Delivery

    3.3.1.  Shipping. SBT shall deliver the Products according to the requirements of the Purchase Order. Title of the Products will pass to SIG upon delivery of the Products as specified by the Purchase Order.

    3.3.2.  Acceptance of Delivery. If SIG determines, in its sole discretion, that the Products are damaged, defective, or do not conform to a Purchase Order, SIG may:

        (a) reject such Products for a refund plus any inspection, shipping and handling, and transportation charges paid by SIG; or

        (b) require prompt correction or replacement of the Products.

    If ten days after receipt of delivery, SIG has not rejected the Products, SIG will be deemed to have accepted the delivery. Payment or inspection of the Products by SIG will not be construed as acceptance of any Products.

3.4. Inspection

    3.4.1.  Inspection by SIG. SIG may inspect and test all components of the Products, including raw materials, components, and subassemblies, and the end Products at all reasonable times and places before, during and after manufacture or shipment. In no event shall SSI be liable for any reduction in value of samples used in connection with any inspection or test. SIG shall provide SBT at least ten (10) business days' notice prior to any inspection or test on SBT's premises; provided however, in the event of a SBT device epidemic failure (as defined below), SIG may inspect SBT's facilities where the product is manufactured with only two (2) business days' notice. For any inspection on SBT's premises, SBT shall provide reasonable facilities and assistance during normal business hours for the safety and convenience of SIG's inspectors in such manner as not unduly to delay SBT's operations. SBT shall not deliver any Products that SIG determines is damaged, defective, or otherwise does not conform to the agreed upon standards of the Product. Products or their components that pass inspection and test at SBT's facilities may still be inspected and rejected by SIG upon delivery to SIG's facility.

    3.4.2.  Inspection by SBT. SBT shall ensure that all Products are tested in accordance with the agreed upon specifications and requirements as amended from time to time. Unless SBT receives prior written approval from SIG, SBT shall only deliver Products that meet the agreed upon specifications and requirements.

3.5. <u>Returns</u>. In addition to its rights of return and other remedies in this Agreement, SBT will accept all returns on SBT Branded Product for any reason. SIG may not return any items that are SIG Branded Product and purchased on valid Purchase Orders.

    (a) SIG returns the Products within 18 months of receipt; and

    (b) returns are made to SBT at SIG's risk and expense.

3.6. <u>Payment</u>

    3.6.1.  <u>Invoicing</u>. SBT shall issue monthly invoices to SIG for the Products. Invoices will:

        (a) be dated equal to or after the shipment date; and

        (b) reference purchase order number, item number, description of Products, unit price of Products, and total amounts due.

    3.6.2.  <u>Payments Made</u>. SIG shall pay SBT the total amount of the invoice within 45 days of the invoice date.

    3.6.3.  <u>Currency</u>. Unless expressly agreed to otherwise, all amounts stated and payments made will be in United States Dollars.

## 4. **Marketing and Promotion**

4.1. <u>SIG Obligations.</u> SIG shall

    (a) be responsible for the financial portion of the marketing campaign, including, but not limited to, videos, advertisements and marketing firm expenses;

    (b) use best efforts to further the promotion, marketing, sale and distribution of the Products, including brand awareness and value;

    (c) establish and maintain a sales and marketing organization sufficient to develop the market potential of the Products;

    (d) establish a distribution method sufficient to make the Products available, including packaging and integrating the Products with other SIG products when appropriate;

    (e) promote the SIG branded SBT Products on the SIG web-store and the SIG SAUER Academy Pro Shop;

    (f) include the Products on the SIG commercial price list; and

    (g) not make any materially misleading or untrue statements concerning the Products.

4.2. <u>SBT Obligations.</u> SBT shall, at no cost to SIG, provide:

    (a) any necessary cooperation, information, material and support, including sales literature and samples of Products, as SIG may request regarding the marketing, promotion, and sales of the Products, and shall notify SIG in the event any such information is materially changed;

    (b) training to SIG's sales associates regarding the Products before the roll-out of any new Products;

    (c) technical support to end-users of the Products; and

(d) development, implementation, monitoring and funding sales and distribution activity at 5% per Product sales (both SIG Branded Products and SBT Branded Products) for SIG Customer Service and Accessories Sales, Factory Sales Representatives and Rep Group Sales.

5.  **Representations and Warranties**
    5.1. Product Warranty. SBT warrants to SIG that for 18 months from the date of delivery, all Products will:
    (a) be free from any defects in workmanship, material and design;
    (b) conform to applicable specifications and other requirements specified by SIG;
    (c) be fit for their intended purpose and operate as intended;
    (d) be merchantable;
    (e) be free and clear of all liens, security interests or other encumbrances; and
    (f) not infringe or misappropriate any third party's patent or other intellectual property rights.

    SIG may pass all warranties granted by SBT under this Agreement to SIG's customers. SBT shall assist SIG in processing any warranty claims relating to the Products.

6.  **Intellectual Property**
    6.1. Confidentiality. Each party shall treat as confidential all Confidential Information of the other party, shall not use such Confidential Information except as expressly set forth in this Agreement or otherwise authorized in writing, shall implement reasonable procedures to prohibit the disclosure, unauthorized duplication, misuse or removal of the other party's Confidential Information and shall not disclose such Confidential Information to any third person except as may be necessary and required in connection with the rights and obligations of such party under this Agreement, and subject to confidentiality obligations at least as protective as those set forth in this Agreement. Each of the parties shall use the same procedures and degree of care which its uses to prevent the disclosure of its own confidential information of like importance to prevent the disclosure or misuse of Confidential Information disclosed to it by the other party under this Agreement, but in no event less than reasonable care. In the event Confidential Information is required to be disclosed, the DEALER will notify SIG prior to disclosure to allow SIG to assert whatever exclusions or exemptions may be available under the relevant laws.
    6.1.1. Confidential Information. "Confidential Information" is all confidential or proprietary information disclosed by one party to the other in connection with this Agreement, whether disclosed before or after the date of the Agreement. Confidential Information disclosed must be either designated by an appropriate stamp, marking, or legend thereon to be of a confidential nature to the disclosing party; or if orally or visually disclosed, such Confidential Information must be

identified as being proprietary to the disclosing party by providing within thirty (30) days of such oral or visual disclosure, a written notice specifically identifying such orally or visually disclosed proprietary information. Confidential Information will not include any information which the receiving party demonstrates by clear and convincing evidence is (a) at the time of disclosure in the public domain or thereafter enters the public domain without any breach of this Agreement by the receiving party, (b) known by the receiving party before time of disclosure, (c) obtained from a third party who is in lawful possession of the information and does not breach an obligation of confidence to the disclosing party regarding such information, or (d) is independently developed by the receiving party without access to, reference to, use or knowledge of the Confidential Information.

6.1.2.   <u>Export Controls</u>. The recipient of Confidential Information shall not knowingly

    (a) export or re-export, directly or indirectly, any technical data as defined be the U.S. Export Administration and International Traffic in Arms Regulations received under this Agreement to;

    (b) disclose such technical data for use in; or

    (c) export or re-export, directly or indirectly,  as any direct product of such technical data to any destination to which such export or re-export is restricted or prohibited by U.S. law, without obtaining prior authorization by the U.S. Department of Commerce or State.

6.1.3.   <u>Effect upon Termination</u>. On the expiration or termination of this Agreement, the receiving party shall promptly return to the disclosing party all copies, whether in written, electronic or other form or media, of the disclosing party's Confidential Information, or destroy all such copies and certify in writing to the disclosing party that such Confidential Information has been destroyed. The confidentiality provisions survive the termination of this Agreement.

6.2. <u>Use of SBT's Trademarks</u>. SIG and its authorized independent sales representatives, subdistributors, successors and assigns are hereby authorized to:

    (a) use SBT's trademarks, service marks and trade names in connection with advertising, promoting or reselling the Products, including in conjunction with SIG's trademarks, service marks and trade names; and

    (b) refer to and advertise itself as the exclusive distributor of the Products.

7. <u>**Indemnity**</u>

7.1. <u>General Indemnification</u>. SBT shall indemnify, defend and hold harmless SIG, its officers, directors, employees, agents, affiliates, successors and permitted assigns (collectively, **"Indemnified Party"**) against any and all losses, damages, liabilities, deficiencies, claims, actions, judgments, settlements, interest, awards, penalties, fines, costs, or expenses of whatever kind, including attorneys' fees, fees and the costs of enforcing any right to indemnification under this Agreement and the cost of pursuing

any insurance providers, incurred by Indemnified Party (collectively, "Losses"), relating to any claim of a third party arising out of or occurring in connection with the Products purchased from SBT or SBT's negligence, willful misconduct or breach of this Agreement. SBT shall not enter into any settlement without SIG's prior written consent.

7.2. Intellectual Property Indemnification. SBT shall indemnify, defend and hold Indemnified Party harmless against any and all Losses arising out of or in connection with any claim that Indemnified Party's use or possession of the Products infringes or misappropriates the patent, copyright, trade secret or other intellectual property right of any third party. In no event shall SBT enter into any settlement without SIG's prior written consent.

8. **Insurance.** SBT shall maintain commercial general liability insurance in appropriate amounts and shall furnish proof of such insurance to SIG upon request.

9. **Limitation of Liability**. EXCEPT FOR LIABILITY FOR INDEMNIFICATION, LIABILITY FOR BREACH OF CONFIDENTIALITY, OR LIABILITY FOR INFRINGEMENT OR MISAPPROPRIATION OF INTELLECTUAL PROPERTY RIGHTS, NEITHER PARTY IS LIABLE FOR CONSEQUENTIAL, INDIRECT, INCIDENTAL, SPECIAL, EXEMPLARY, PUNITIVE OR ENHANCED DAMAGES, ARISING OUT OF OR RELATING TO ANY BREACH OF THIS AGREEMENT, WHETHER OR NOT THE POSSIBILITY OF SUCH DAMAGES HAD BEEN DISCLOSED IN ADVANCE BY THE OTHER PARTY OR WAS FORESEEABLE, REGARDLESS OF THE LEGAL OR EQUITABLE THEORY (CONTRACT, TORT OR OTHERWISE) UPON WHICH THE CLAIM IS BASED, AND NOTWITHSTANDING THE FAILURE OF ANY AGREED OR OTHER REMEDY OF ITS ESSENTIAL PURPOSE.

10. **Dispute Resolution**

10.1. Escalation. The parties agree that any material dispute between the parties relating to this Agreement will be submitted to a panel of two senior executives of SIG and SBT. Either party may initiate this proceeding by notifying the other party pursuant to the notice provisions of this Agreement. Within thirty (30) days from the date of receipt of the notice, the parties' executives shall confer (via telephone or in person) in an effort to resolve such dispute. Each party's executives shall be identified by notice to the other party, and may be changed at any time by notice.

10.2. Choice of Law. This Agreement, including all exhibits, schedules, attachments and appendices attached to this Agreement and thereto are governed by, and construed in accordance with, the laws of the State of New Hampshire, United States of America, without regard to the conflict of laws provisions thereof to the extent such principles or

rules would require or permit the application of the laws of any jurisdiction other than those of the State of New Hampshire.

10.3. <u>Choice of Forum</u>. Each Party irrevocably and unconditionally agrees that it will not commence any action, litigation or proceeding of any kind whatsoever against the other Party in any way arising from or relating to this Agreement, including all exhibits, schedules, attachments and appendices attached to this Agreement, and all contemplated transactions in any forum other than the courts of the State of New Hampshire. Each Party irrevocably and unconditionally submits to the exclusive jurisdiction of such courts and agrees to bring any such action, litigation or proceeding only in the courts of the State of New Hampshire.

## 11. <u>Term and Termination</u>

11.1. <u>Term.</u> The term of this Agreement commences on the Effective Date and terminates on June 1, 2017.

11.2. <u>Renewal</u>. The Parties may agree in writing to extend the Term of this Agreement for one or more terms of one (1) year.

11.3. <u>Termination For Convenience</u>. SIG may terminate this Agreement at any time for any reason or no reason upon giving written notice of termination to SBT. Upon receipt of such notice, SBT shall immediately cease to incur expenses pursuant to this Agreement that has been terminated unless otherwise directed in the termination notice. SBT shall also take all reasonable steps to mitigate the cost to SIG for terminating this Agreement. Within sixty (60) days from the date of notice, SBT shall notify SIG of costs directly incurred under this agreement up to the date of termination. In no event shall such cost exceed the unpaid balance due: (i) for conforming material delivered prior to receipt of SIG's termination notice; and (ii) on purchase orders previously issued in conformance with this Agreement.

11.4. <u>Termination for Cause</u>. Either Party may terminate this Agreement

(a) upon notice to the other if the other Party is in breach of this Agreement and either the breach cannot be cured or, if the breach can be cured, it is not cured within sixty (60) days following the other Party's receipt of notice of such breach;

(b) if the other Party:

(i) becomes insolvent or is generally unable to pay, or fails to pay, its debts as they become due;

(ii) files or has filed against it, a petition for voluntary or involuntary bankruptcy or otherwise becomes subject, voluntarily or involuntarily, to any proceeding under any domestic or foreign bankruptcy or insolvency law;

(iii) seeks reorganization, arrangement, adjustment, winding-up, liquidation, dissolution, composition or other relief with respect to it or its debts;

(iv) makes or seeks to make a general assignment for the benefit of its creditors; or

      v)  applies for or has a receiver, trustee, custodian or similar agent appointed by order of any court of competent jurisdiction to take charge of or sell any material portion of its property or business.

11.5. <u>Effect of Expiration or Termination</u>. Upon the expiration or earlier termination of this Agreement: (a) All related purchase orders are automatically terminated; and (b) Each Party shall promptly return or destroy all documents and tangible materials (and any copies) containing, reflecting, incorporating or based on the other Party's Confidential Information.

## 12. <u>Miscellaneous</u>

12.1. <u>Assignment</u>. Neither Party may assign any of its rights under this Agreement without the prior written consent of the other Party.

12.2. <u>Successors and Assigns</u>. This Agreement is binding on and inures to the benefit of the Parties to this Agreement and their respective permitted successors and permitted assigns.

12.3. <u>No Third-Party Beneficiaries</u>. This Agreement benefits solely the Parties to this Agreement and their respective permitted successors and assigns and nothing in this Agreement, express or implied, confers on any other Person any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

12.4. <u>Counterparts</u>. This Agreement may be executed in counterparts, each of which is deemed an original, but all of which together are deemed to be one and the same agreement.

12.5. <u>Independent Contractors.</u> The relationship between the parties is that of independent contractors. Nothing contained in this Agreement shall be construed as creating any agency, partnership, franchise, business opportunity, joint venture or other form of joint enterprise, employment or fiduciary relationship between the parties, and neither party shall have authority to contract for or bind the other party in any manner whatsoever. No relationship of exclusivity shall be construed from this Agreement.

12.6. <u>Notices</u>. All notices, requests, consents, claims, demands, waivers and other communications under this Agreement must be in writing and addressed to the other Party at its address set forth above.

12.7. <u>Force Majeure</u>. Any delay or failure of either Party to perform its obligations under this Agreement will be excused to the extent that the delay or failure was caused directly by an event beyond such Party's reasonable control, without such Party's fault or negligence and that by its nature could not have been foreseen by such Party or, if it could have been foreseen, was unavoidable (which events may include natural disasters, embargoes, explosions, riots, wars or acts of terrorism) (each, a "Force Majeure Event"). A Party shall give the other Party prompt written notice of any event or circumstance that is reasonably likely to result in a Force Majeure Event, and the anticipated duration of such Force Majeure Event. An affected Party shall use all diligent efforts to end the Force

Majeure Event, ensure that the effects of any Force Majeure Event are minimized and resume full performance under this Agreement.

12.8. <u>Waiver</u>. No waiver by any party of any of the provisions of this Agreement shall be effective unless explicitly set forth in writing and signed by the party so waiving. Except as otherwise set forth in this Agreement, no failure to exercise, or delay in exercising, any rights, remedy, power or privilege arising from this Agreement shall operate or be construed as a waiver thereof, nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.

12.9. <u>Severability</u>. If any term or provision of this Agreement is invalid, illegal or unenforceable in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction.

12.10. <u>Entire Agreement</u>. This Agreement, including and together with any related exhibits, schedules, attachments and appendices, constitutes the sole and entire agreement of the Parties with respect to the subject matter contained herein, and supersedes all prior and contemporaneous understandings, agreements, representations and warranties, both written and oral, regarding such subject matter.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

SIG SAUER, Inc.

By

Name: Steven Shawver
Title: Chief Legal Officer

SB Tactical, LLC

By

Name: Alessandro Bosco
Title: Manager