UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

<u>NST Global, LLC, d/b/a SB Tactical</u>

       v.                                             Case No. 1:19-cv-00792-PB
                                    Opinion No. 2024 DNH 067

<u>Sig Sauer Inc.</u>

## MEMORANDUM AND ORDER

NST Global, LLC, filed this patent infringement action, alleging that Sig Sauer Inc. infringes two of its patents, U.S. Patent No. 8,869,444 ("the '444 Patent") and U.S. Patent No. 9,354,021 ("the '021 Patent") (collectively, "the Patents"). In this Memorandum and Order, I construe eight disputed patent terms on which the infringement claims are based.

## I.    BACKGROUND

The Patents disclose "a forearm-gripping stabilizing attachment for a handgun that secures to a rearward end of [a] handgun frame and engages a user's forearm." '444 Patent col. 1 ll. 13-17; '021 Patent col. 1 ll. 16-20. The stabilizing attachment is designed to steady the gun during shooting, particularly one-handed shooting, and allow for more accurate and proficient discharge. '444 Patent col. 1 ll. 22-40; '021 Patent col. 1 ll. 24-42.

Shortly after the '444 Patent was granted, Sig Sauer became the sole distributor and licensee of NST's stabilizing attachment. Doc. 97 at 7. But in

2018, NST learned that Sig Sauer had developed its own stabilizing attachment, id., and filed suit for direct infringement of the Patents, as well as induced and contributory infringement of the '444 Patent, Doc. 1 at 9-12.

About one year into the litigation, Sig Sauer filed two petitions for inter partes review (IPR) before the Patent and Trademark Appeals Board (PTAB), challenging all of the Patents' claims but requesting no claim construction. Doc. 68-3 ("[N]o terms need construction beyond their ordinary and customary meaning to one having ordinary skill in the art."); Doc. 68-4 (same). Sig Sauer then requested to stay this case pending the resolution of the IPRs, which I granted. Doc. 68; Doc. 73. In June 2021, PTAB completed its IPRs and issued its Final Written Decisions, upholding certain claims and invalidating others for obviousness. Doc. 75-1 at 67; Doc. 75-2 at 66. The stay was subsequently lifted in July 2023. July 11, 2023, Docket Entry.

At present, the only claims asserted against Sig Sauer are for the infringement of claims 2, 11, and 12 of the '444 Patent and claim 2 of the '021 Patent (collectively, "the asserted claims"), all of which are dependent claims adding the element of "elastomeric material." Doc. 96 at 8. The parties now dispute the proper construction of eight terms that appear within those claims and the independent claims on which they depend (claims 1 and 10 of the '444 Patent and claim 1 of the '021 Patent). I reproduce each of the claims below and highlight the terms that are in dispute.

2

## Claim 1 of the '444 Patent

What is claimed is:

1. <u>A forearm-gripping stabilizing attachment for a handgun, the handgun having a support structure extending rearwardly from the rear end of the handgun, the forearm-gripping stabilizing attachment</u>, comprising:

a <u>body</u> having a front end, a rear end, an upper portion, a lower portion, and a passage longitudinally extending within said upper portion and at least through said front end of said body, the <u>support structure of the handgun</u> being <u>telescopically receivable by said passage</u>;

said lower portion being <u>bifurcated so as to define a pair of spaced flaps</u> between which a user's forearm is received when securing the stabilizing attachment to the user's forearm; and

a strap connected to said body, said strap securing said spaced flaps to retain the user's forearm between said spaced flaps when the stabilizing attachment is secured to a user's forearm.

<u>'444 Patent</u> col. 5 ll. 65-67, col. 6 ll. 1-2.

## Claim 2 of the '444 Patent

2. The forearm-gripping stabilizing attachment of claim 1, wherein said spaced flaps are constructed of an <u>elastomeric material</u> and at least partially conform to and grip a user's forearm when the user's forearm is disposed between said spaced flaps.

<u>Id.</u> col. 6 ll. 17-21.

## Claim 10 of the '444 Patent

10. <u>A forearm-gripping stabilizing attachment for a handgun, the handgun having a support structure extending rearwardly from the rear end of the handgun, the forearm-gripping stabilizing attachment</u>, comprising:

a <u>body</u> having a passage longitudinally extending therein and at least through a front end of said body, the <u>support structure of the handgun</u> being <u>telescopically receivable by said passage</u>;

said body defining a space within which a user's forearm is removably receivable;

a strap connected to said body, said strap preventing withdrawal of a user's forearm from said space when the forearm gripping stabilizing attachment is secured to the user's forearm; and

wherein said body is <u>bifurcated and defines a pair of spaced flaps</u>, said pair of spaced flaps is defining said space within which the user's forearm is removably receivable.

<u>Id.</u> col. 6 ll. 54-67, col. 7 ll. 1-3.

Claim 11 of the '444 Patent

11. The forearm-gripping stabilizing attachment of claim 10, wherein said pair of spaced flaps are constructed of an <u>elastomeric material</u>.

<u>Id.</u> col. 7 ll. 4-6.

Claim 12 of the '444 Patent

12. The forearm-gripping stabilizing attachment of claim 11, wherein said pair of spaced flaps at least partially conform to a user's forearm when the user's forearm is disposed between said pair of space flaps.

<u>Id.</u> col. 7 ll. 7-10.

Claim 1 of the '021 Patent

What is claimed is:
1. <u>A forearm-gripping stabilizing attachment for a handgun, the handgun having a support structure extending rearwardly from the rear end of the handgun, the forearm-gripping stabilizing attachment</u>, comprising:

    a <u>body</u> having a front end, a rear end, an upper portion, a lower portion, and a passage longitudinally extending within said upper portion and at least through said front end of said body, the <u>support structure of the handgun being telescopically receivable by said passage</u>;

    <u>said lower portion having at least one flap extending from said upper portion</u>;

    a strap connected to said body, said strap securing said at least one flap to a user's forearm when the stabilizing attachment is secured to a user's forearm; and

    wherein said passage extends entirely through said body between said front end and said rear end of said body.

<span style="color:blue">'021 Patent</span> col. 6 ll. 11-15.

Claim 2 of the '021 Patent

2. The forearm-gripping stabilizing attachment of claim 1, wherein said at least one flap is constructed of an <u>elastomeric material</u>.

<u>Id.</u> col. 6 ll. 28-30.

4

## II.   <u>STANDARD OF REVIEW</u>

"[T]he claims of a patent define the invention to which the patentee is entitled the right to exclude." <u>Phillips v. AWH Corp.</u>, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (quoting <u>Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.</u>, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). As a result, "a claim construction analysis must begin and remain centered on the claim language itself, for that is the language the patentee has chosen to particularly point out and distinctly claim.'" <u>Innova/Pure Water, Inc.</u>, 381 F.3d at 1116 (cleaned up). "[T]he words of a claim 'are generally given their ordinary and customary meaning.'" <u>Phillips</u>, 415 F.3d at 1312 (quoting <u>Vitronics Corp. v. Conceptronic, Inc.</u>, 90 F.3d 1576, 1582 (Fed. Cir. 1996)). The ordinary and customary meaning of a claim term is "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention" <u>Id.</u> at 1313.

Additionally, patent claims are "not construed in the abstract," but rather "in the context in which the term was presented and used by the patentee." <u>Fenner Invs., Ltd. v. Cellco P'ship</u>, 778 F.3d 1320, 1322-23 (Fed. Cir. 2015); <u>see</u> <u>also</u> <u>Aventis Pharms. Inc. v. Amino Chems. Ltd.</u>, 715 F.3d 1363, 1373 (Fed. Cir. 2013) (explaining that judges must construe claims "in light of the appropriate context in which the claim term is used"). The other claims in the patent—"both asserted and unasserted"—can be "valuable

sources of enlightenment as to the meaning of a claim term," Phillips, 415 F.3d at 1314, and the specification "is always highly relevant to the claim construction analysis" and often "the single best guide to the meaning of a disputed term." Phillips, 415 F.3d at 1315 (quoting Vitronics Corp., 90 F.3d at 1582). Although the written description and other portions of the specification may contextualize a term, "they cannot be used to narrow a claim term to deviate from the plain and ordinary meaning unless the inventor acted as his own lexicographer or intentionally disclaimed or disavowed claim scope." Id.

The patent document and the prosecution history constitute intrinsic evidence and deserve priority in claim construction. WesternGeco LLC v. ION Geophysical Corp., 889 F.3d 1308, 1323 (Fed. Cir. 2018). But in the event that the intrinsic evidence does not resolve an ambiguity in a disputed claim term, I may turn to extrinsic evidence, such as inventor and expert testimony, dictionaries, and treatises. Phillips, 415 F.3d at 1317; see also V-Formation, Inc. v. Benetton Grp. SpA, 401 F.3d 1307, 1310-11 (Fed. Cir. 2005) (noting that intrinsic evidence is afforded the greatest weight in determining what a person of ordinary skill would have understood a claim to mean but that extrinsic evidence may also be helpful).

## III.   ANALYSIS

The parties have asked me to construe eight terms. I do so accordingly.

6

A.    Claim Preambles

Proposed Constructions:

| Sig Sauer | Preamble is limiting |
|-----------|----------------------|
| NST       | Preamble is not limiting |

First, the parties dispute whether the preamble—that is, the text of each independent claim preceding the word "comprising," Bicon, Inc. v. Straumann Co., 441 F.3d 945, 949 (Fed. Cir. 2006)—is limiting on the claims.

There is "[n]o litmus test defin[ing] when a preamble limits claim scope." Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc., 289 F.3d 801, 808 (Fed. Cir. 2002). Rather, the determination as to whether a preamble is or is not limiting requires a "review of the entire patent to gain an understanding of what the inventors actually invented and intended to encompass by the claim." Id. (cleaned up); see also Am. Med. Sys, Inc. v. Biolitec, Inc., 618 F.3d 1354, 1358 (Fed. Cir. 2010) (explaining that the analysis rests on "the facts of each case in light of the claim as a whole and the invention described in the patent") (quoting Storage Tech. Corp. v. Cisco Sys., Inc., 329 F.3d 823, 831 (Fed. Cir. 2003)).

A preamble is not limiting "where a patentee defines a structurally complete invention in the claim body and uses the preamble only to state a purpose or intended use for the invention." Arctic Cat Inc. v. GEP Power

Prods., Inc., 919 F.3d 1320, 1328 (Fed. Cir. 2019) (quoting Rowe v. Dror, 112 F.3d 473, 478 (Fed. Cir. 1997)); see also Catalina Mktg. Int'l, 289 F.3d at 809 (noting that a preamble is not limiting "when the claim body describes a structurally complete invention such that deletion of the preamble phrase does not affect the structure or steps of the claimed invention").

In contrast, when the preamble is used to help "define the subject matter of the claimed invention," then it is limiting on the claim. Allen Eng'g Corp. v. Bartell Indus., Inc., 299 F.3d 1336, 1346 (Fed. Cir. 2002) (quoting Bell Commc'ns Rsch., Inc. v. Vitalink Commc'ns Corp., 55 F.3d 615, 620 (Fed. Cir. 1995)). For example, a preamble is limiting if it "recites essential structure or steps" or "is 'necessary to give life, meaning, and vitality' to the claim." Catalina Mktg. Int'l, Inc., 289 F.3d at 808 (quoting Pitney Bowes, Inc. v. Hewlett-Packard Co., 182 F.3d 1298, 1305 (Fed. Cir. 1999)). Additionally, "[w]hen limitations in the body of the claim rely upon and derive antecedent basis from the preamble, then the preamble may act as a necessary component of the claimed invention" and function as a limitation on the claims. Eaton Corp. v. Rockwell Int'l Corp., 323 F.3d 1332, 1339 (Fed. Cir. 2003).

Here, each of the independent claims at issue (claims 1 and 10 in the '444 Patent and claim 1 of the '021 Patent) begin with the same preamble: "A forearm-gripping stabilizing attachment for a handgun, the handgun having

a support structure extending rearwardly from the rear end of the handgun, the forearm-gripping stabilizing attachment, comprising . . . ." '444 Patent col. 5 ll. 66-67, col. 6 ll. 1-2, 54-57; '021 Patent col. 6 ll. 12-15. NST argues that this preamble is not limiting because it merely "set[s] the stage for the invention, . . . stating a purpose or intended use for the invention." Doc. 97 at 22; see also Doc. 98 at 11 ("[T]he preambles' reference [to the term 'handgun'] generally refers to the purpose or intended use and does not provide any context essential to understanding the meaning of 'handgun.'") (cleaned up). It contends that "each claim body describes a structurally complete invention," which is, "in essence, a body and a strap with the additional elements described in each of the claims." Doc. 97 at 21-22. Accordingly, it concludes that the preamble "does not affect the structure or steps of the claimed invention" or otherwise "give life, meaning, and vitality to the claim[s]." Id.

Sig Sauer, in turn, claims that the preamble should be construed as limiting because it "recites essential structure" of the invention. Doc. 96 at 13. It agrees with NST that without the language of the preamble, the invention comprises the "body," "strap," and "additional elements," Doc. 99 at 11; however, it argues that these features alone do not recite a structurally complete invention as they cannot accomplish the "purported advantages of the invention"—including improved gun control, shooting accuracy, and

9

weight distribution—which "only exist in relation to the handgun." Doc. 96 at 13. Instead, Sig Sauer contends, the preamble not only references the "structural elements" of "a handgun" and "a support structure," thereby providing the necessary antecedent basis for the same terms used later in the claim bodies, but it also describes the support structure as "extending rearwardly from the rear end of the handgun," which limits the "specific structural arrangement" of those elements. Doc. 99 at 9-10; see also Doc. 96 at 14-15. Accordingly, Sig Sauer concludes that the preamble "describes more than just an intended use." Doc. 99 at 9. I agree with Sig Sauer.

As Sig Sauer correctly notes, the preamble introduces the terms "a handgun" and "a support structure" and therefore provides antecedent basis for "the support structure of the handgun" as used in the bodies of the independent claims. See Eaton Corp., 323 F.3d at 1339. Moreover, these terms are not reintroduced anywhere the body of the claims. Cf. Symantec Corp. v. Computer Assocs. Int'l, Inc., 522 F3d. 1279, 1288-89 (Fed. Cir. 2008) (explaining that a preamble is generally not construed as limiting if it is "merely duplicative of the limitations in the body of the claim"). But the preamble at issue goes even further.

The preamble describes the structural arrangement between the handgun and the stabilizing attachment by reciting the support structure as "extending rearwardly from the rear end of the handgun." When read

together with the claim bodies' recitation of the support structure "being telescopically receivable by" the passage, see, e.g., '444 Patent col. 6 ll. 6-7, the preamble helps define the precise structural arrangement in which the handgun and the stabilizing attachment are secured together. Accordingly, the preamble goes beyond merely describing an intended use of the invention and instead provides essential structure of the invention. Cf. Cochlear Bone Anchored Sols. AB v. Oticon Med. AB, 958 F.3d 1348, 1355 (Fed. Cir. 2020) (holding that the preamble's recitation of "for rehabilitation of unilateral hearing loss" was not limiting on the claims for a patented hearing aid because it was "merely a statement of intended use" and did not identify any "structure for the apparatus claimed"); Marrin v. Griffin, 599 F.3d 1290, 1294 (Fed. Cir. 2010) (finding the preamble language "for permitting a user to write thereon without the use of a marking implement" merely an "intended use" of the patented scratch-off labels).

NST responds by arguing that the prosecution history of the '444 Patent renders this structural argument inapposite. Doc. 98 at 11. It explains that, in response to a rejection for indefiniteness, it successfully argued that it was not claiming the handgun as part of the invention and that the term "a support structure extending rearwardly from the rear end of the handgun" was simply "a property of an existing product upon which a positively recited structure (the claimed body) is intended to act upon." Doc. 97-4 at 21-22. But

this argument is unpersuasive because the specification and claims make clear that the Patents exclusively seek to cover a stabilizing attachment that secures to a handgun in a precise way—that is, via a rearwardly extending support structure that is telescopically receivable by the body's passage. Thus, the support structure extending rearwardly is not analogous to a general purpose or intended use, such as, for example, "securing the handgun."

Accordingly, because the "preamble is essential to understand limitations or terms in the claim body," I find the preamble to be limiting. Catalina Mktg. Int'l, Inc., 289 F.3d at 808.

B.     "Support structure"

Proposed Constructions:

| Sig Sauer | Means-plus-function limitation where the function is "being telescopically receivable within the passage" and the means is "a single cylindrical tube which extends rearward from the handgun" |
|-----------|------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
| NST       | No construction necessary; plain and ordinary meaning                                                                                                                                          |

Next, the parties disagree over whether the term "support structure" is properly construed as a means-plus-function limitation. "Means-plus-function claiming occurs when a claim term is drafted in a manner that invokes [35

12

U.S.C. § 112(f)].”[1] Williamson v. Citrix Online, LLC, 792 F.3d 1339, 1347 (Fed. Cir. 2015). Section 112(f) applies where a claim limitation is written in terms of "a function to be performed" rather than the more traditional "structure for performing that function." Id. Such a limitation must be construed as "restricting the scope of coverage" to the structure, materials, or acts that are recited in the specification and which correspond to the claimed function as well as their equivalents. Id.

To determine whether a claim limitation is drafted in a means-plus-function format, a court must determine "whether it connotes sufficiently definite structure to a person of ordinary skill in the art." Dyfan, LLC v. Target Corp., 28 F.4th 1360, 1365 (Fed. Cir. 2022). If it does, then the limitation is not drafted in means-plus-function format, and § 112(f) does not apply. Id. If it does not, however, then the limitation is drafted in means-plus-function format, and the court proceeds to the "two-step process" for construing the term. Id. "First, the court must identify the claimed function,"

---

[1]    Section 112(f) provides:

An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.

and "[s]econd, [it] must identify the corresponding structure in the specification that performs the recited function." Chicago Bd. Options Exch., Inc. v. Int'l Sec. Exch., LLC, 677 F.3d 1361, 1367 (Fed. Cir. 2012).

Courts presume that a claim limitation is subject to § 112(f) "[w]hen the claim uses the word 'means.'" Williamson, 792 F.3d at 1348. And, inversely, in the absence of the word "means," courts presume that a claim is not drafted in means-plus-function format. Id. However, this presumption against interpreting a term as a means-plus-function limitation can be overcome "if the challenger demonstrates that the claim term fails to recite sufficiently definite structure or else recites function without reciting sufficient structure for performing that function." Id. (cleaned up) (explaining that the "essential inquiry is not merely the presence or absence of the word 'means,' but whether the words of the claim are understood by persons of ordinary skill in the art to have a sufficiently definite meaning as the name for structure"); see also MTD Prods. Inc. v. Iancu, 933 F.3d 1336, 1342 (Fed. Cir. 2019) ("The ultimate question is whether the claim language, read in light of the specification, recites sufficiently definite structure to avoid § 112(f).") (cleaned up).

A claim term may fail to recite sufficiently definite structure if it constitutes a "nonce word," a "generic term[] or black box recitation[] of structure or abstractions." Zeroclick, LLC v. Apple Inc., 891 F.3d 1003, 1008

(Fed. Cir. 2018). Nonce words "operate as substitutes for 'means' and presumptively bring the disputed claims limitations within the ambit of [§ 112(f)]." Id.; see also MTD Prods. Inc., 933 F.3d at 1341 (explaining that nonce words "operate as a substitute for 'means'" to "claim a particular function rather than describe a 'sufficiently definite structure'"). For example, courts have found words such as "module," "mechanism," "element," and "device" to be common nonce words, as they often "reflect nothing more than verbal constructs" and are used "in a manner that is tantamount to using the word 'means.'" Williamson, 792 F3d. at 1350. In analyzing whether a claim term is a nonce word, the "critical question is whether 'the claim term is used in common parlance or by persons of skill in the pertinent art to designate [a particular structure or a class of structures].'" MTD Prods. Inc., 993 F.3d at 1341 (quoting Skky, Inc. v. MindGeek, s.a.r.l., 859 F.3d 1014, 1019 (Fed. Cir. 2017)).

Here, Sig Sauer argues that, although "support structure" does not use the word "means," the presumption against interpreting the term as a means-plus-function limitation has nevertheless been overcome because "support structure" is a nonce word and the patent does not otherwise recite sufficient structure. Doc. 96 at 21 (asserting that "support structure" functions as a substitute for "means for supporting'" or "means to functionally connect the handgun to the brace to achieve the 'support' of the handgun" and

provides no "definition or structural description"). Accordingly, it contends that the claim is drafted in means-plus-function format and must be construed according to its disclosed function and the corresponding structures. Specifically, Sig Sauer contends that the claimed function of the support structure is "[being] telescopically receivable [within] said passage." Id. at 21-22. Sig Sauer also asserts that the specification discloses two structures—a buffer tube or "tubular member"—corresponding to this function and therefore argues that the corresponding structure must be "a single cylindrical tube which extends rearward from the handgun." Id.

NST, in turn, contends that "support structure" cannot practicably be defined in terms of structure because there is a "myriad of possib[le]" support structures. Doc. 97 at 26-28 (citing expert testimony provided during the IPR that there are "hundreds if not thousands of ways to provide a support structure on a firearm that is 'other than a buffer tube'"). Instead, it asserts that its disclosure of two kinds of support structures in the specification— buffer tubes and other tubular members—is sufficient to avoid means-plus-function claiming. Id. It then proceeds to argue that, even if I were to conclude that the term was drafted in means-plus-function format, that the function of the support structure is not "being telescopically receivable within said passage," as Sig Sauer contends. Doc. 98 at 16-17 (stating, without elaboration, that "being telescopically receivable within said passage" merely

"describes the details of the invention"). And lastly, NST asserts that Sig Sauer's proposed construction of the corresponding structure improperly limits the support structure to a specific "number (single), shape (cylindrical), form (tube), and location (extends rearward)." Id. I address each argument in turn.

As an initial matter, I agree with Sig Sauer that "support structure" is a nonce word. As other courts have noted, "'structure' is a generic and abstract nonce word that does not actually identify any structure." Energy Env't Corp. v. City of Denver, No. 21-cv-02235, 2024 WL 1300266, at *7 (D. Colo. Mar. 26, 2024); accord Intell. Ventures I LLC v. AT&T Mobility LLC, No. 13-1668, 2016 WL 4363485 (D. Del. Aug. 12, 2016) (explaining that "the claim fails to recite sufficiently definite structure," or "any structure," because "the claim merely describes the structure as 'a structure'"), vacated in part on other grounds, Intell. Ventures I LLC v. T-Mobile USA, Inc., 902 F.3d 1372 (Fed. Cir. 2018); see also Pinpoint Inc. v. Hotwire, Inc., No. 11 C 5597, 2013 WL 1174688, at *8 (N.D. Ill. Mar. 20, 2013) (explaining that although a district court's claim construction is not binding on another court, it may nevertheless be "helpful and persuasive"). Additionally, the prefix "support" merely connotes a certain function and thus does nothing to impart any structural definition into the term "structure." See Williamson, 792 F.3d

at 1351 (explaining that prefixes or modifiers "can change the meaning" of a nonce word so as to convey sufficient structure).

Moreover, NST neither identifies any other language in the claims that might otherwise bestow some degree of structure to the term nor cites any evidence as to how the term "support structure" is commonly understood by a person of ordinary skill in the art. NST is correct that the specification discloses buffer tubes and other tubular members as possible support structures, however, this is insufficient to avoid means-plus-function claiming because "example[s] of a" support structure is not the same as "a definition of the" support structure. Kyocera Senco Indus. Tools Inc. v. Int'l Trade Comm'n, 22 F.4th 1369, 1381 (Fed. Cir. 2022). Accordingly, although the term "support structure" does not incorporate the word "means," the presumption against interpreting the term as a means-plus-function term has been overcome, and I proceed to construing the term.

First, I must determine the claimed function of the "support structure," and I agree with Sig Sauer that the function is "being telescopically receivable by said passage." The claims, both alone and read in light of the specification, make clear that the primary, if not sole, purpose of the support structure is to be received by the passage extending longitudinally throughout the upper portion of the body of the stabilizing attachment so as

to secure the handgun to the stabilizing attachment. See, e.g., '444 Patent col. 6 ll. 6-7. NST fails to identify any other function of the support structure.

Next, as to the structures corresponding to this function, I again agree with Sig Sauer that the specification discloses two possible corresponding structures—"a buffer tube" and "tubular member." See, e.g., id. col. 5 ll. 11-24. I disagree, however, with Sig Sauer's proposed construction of the corresponding structure as "a single cylindrical tube which extends rearward from the handgun" as it is too restrictive as to the number and shape of the support structure.[2]

First, as the parties appear to agree, the specification contemplates the support structure being "a buffer tube" or other "tubular member." See, e.g., '444 Patent col. 3 ll. 51-53, col. 5, ll. 21-24 (emphasis added). And while "a" in common parlance generally connotes singularity, "[a]s a general rule," patent law equates "the words 'a' or 'an' in a patent claim . . . [with] 'one or more.'" TiVo, Inc. v. EchoStar Commc'n Corp., 516 F.3d 1290, 1303 (Fed. Cir. 2008) (acknowledging that this analysis "depends heavily on the context of its use"). In light of this general rule, and because Sig Sauer fails to develop any

---

[2]    Sig Sauer requests that I construe the support structure as "extending rearwardly from the rear end of the handgun." Doc. 96 at 19. However, because this limitation is included in the preamble of the asserted claims, which I have already determined to be limiting, I need not incorporate "extending rearwardly from the rear end of the handgun" into the corresponding structure.

sufficient argument as to why I should nonetheless construe "a buffer tube" or "tubular member" to be singular, I decline to construe "a" support structure to mean "a single" support structure.

Second, I disagree with Sig Sauer that the support structure must be "cylindrical." Although the specification provides examples of support structures that are a "tube" or "tubular," "tubular" and "cylindrical" are not necessarily synonymous. "Tubular" is defined as "having the form of or consisting of a tube" or "made or provided with tubes," Tubular, MERRIAM-WEBSTER DICTIONARY, https:/www.merriam-webster.com/dictionary/tubular [https://perma.cc/M79U-SKCQ], and "tube," in turn, is defined as "any of various usually cylindrical structures or devices," Tube, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/tube [https://perma.cc/32Q3-7KHH] (emphasis added). Thus, while tubes are often cylindrical, they need not be cylindrical, and one can reasonably conceive of non-cylindrical tubes in other contexts, such as square metal tubes that slide together to create a desk frame. Accordingly, I decline to adopt Sig Sauer's position that the support structure must be cylindrical.

Therefore, in sum, I agree with Sig Sauer that the corresponding structures are "a buffer tube" and "tubular member," as well as their equivalents, but I decline to construe these as necessarily being singular, tubular structures.

C.    "[Support structure] of the handgun"

<u>Proposed Constructions:</u>

| Sig Sauer | "The support structure that is an integral part of the handgun" |
|-----------|------------------------------------------------------------------|
| NST | No construction necessary; plain and ordinary meaning |

The parties next disagree as to whether the term "[support structure] of the handgun" is limited to support structures that are integral to—that is, "built into and part of"—the handgun, as Sig Sauer contends, Doc. 96 at 22, or whether, as NST argues, it also includes "non-integrated" support structures that are attached to the gun via a bracket, Doc. 98 at 18. I agree with NST.

The term "[support structure] of the handgun" is recited three times within the asserted claims, each time describing the support structure as being telescopically receivable by the passage. '444 Patent col. 6 ll. 6-7, 59-61; '021 Patent col. 6 ll. 19-20. Nothing in this claim language supports the limitation that Sig Sauer proposes. Moreover, looking at nonasserted, dependent claims 7, 8, and 9 of the '444 Patent provides additional clarity and support for NST's broader reading of the term. See Vitronics Corp., 90 F.3d at 1582 ("First, we look to the words of the claims themselves, both asserted and nonasserted, to define the scope of the patented invention.").

21

Claim 7 claims a support structure that is "a buffer tube," while claims 8 and 9 encompass a support structure "other than a buffer tube" and a support structure "secured to [a bracket, said bracket secured to said handgun]," respectively. '444 Patent col. 6 ll. 47-53. The inclusion of "a buffer tube" as a limitation on the term "support structure" in claim 7 "makes it likely that the patentee did not contemplate that the term . . . already contained that limitation." Phillips, 415 F.3d at 1324-25 (explaining that specific limitations "would be unnecessary" if persons of ordinary skill in the art understood a term to "inherently" include that limitation). In other words, if "support structure" was understood to be limited to only integral buffer tubes, then claim 7 would be rendered entirely redundant, which is disfavored in claim construction. Dow Chem. Co. v. United States, 226 F.3d 1334, 1342 (Fed. Cir. 2000) (concluding that an independent claim should be construed more broadly than its dependent claims to avoid rendering those dependent claims redundant). And, given that "claim terms are presumed to be used consistently throughout the patent, such that the usage of a term in one claim can often illuminate the meaning of the same term in other claims," this supports NST's position. Rsch. Plastics, Inc. v. Fed. Packaging Corp., 421 F.3d 1290, 1295 (Fed. Cir. 2005).

The only evidence Sig Sauer offers in support of its proposed construction is one citation to Figure 1, which illustrates a handgun equipped

with a "buffer tube or the like," and two citations to the specification in which the passage is described as telescopically receiving "a <u>portion</u> of the handgun" and the handgun is described as "<u>having</u> a support structure." Doc. 96 at 22-23 (emphasis added). But neither argument is persuasive. In citing to Figure 1, Sig Sauer seeks to limit the invention to a preferred embodiment, which the Federal Circuit has "repeatedly cautioned against." Williamson, 792 F.3d at 1346-47 (cleaned up). Moreover, with regard to its citations to the specification, Sig Sauer does not provide any developed argument or evidence supporting its contention that a person of ordinary skill in the art would understand "portion" or "having" to inherently include the concept of integrality. But even so, Sig Sauer overreads the specification. See Liebel-Flarsheim Co. v. Medrad, Inc., 358 F.3d 898, 904 (Fed. Cir. 2004) (warning courts to be careful not to cross the "fine line" that separates a proper use of the specification as a source of meaning from an improper use of the specification to read into a claim a limitation that it does not contain).

The specification of the '444 Patent only describes the support structure in terms of its location and function, neither of which rely on or are in any way altered by the integrality of the support structure. For example, the patent consistently describes the support structure as "extending rearwardly from the rear end of the handgun," <u>see</u>, <u>e.g.</u>, '444 Patent col. 1 ll. 51-53, and being "telescopically receivable by the passage" so as to secure the stabilizing

attachment to the handgun, see, e.g., id. col. 1 ll. 55-57. But the specification also makes clear that because "not every hand gun is provided with a suitable tubular support or similar structure that rearwardly extends from the hand gun to which the stabilizing brace . . . may be attached," the patent contemplates alternative support structures that comport with the same general location and function as an integral buffer tube. Id. col. 5 ll. 18-24. For example, one embodiment describes a "tubular member . . . secured to a bracket . . . that is secured to the hand gun" such that the tubular member "extends rearwardly outward from the butt end or rear end . . . of the handgun" so as to "provide[] suitable support to which the stabilizing brace . . . may be attached by telescopically receiving the tubular member within [the] passage." Id. col. 5 ll. 25-33.

Accordingly, I decline to adopt Sig Sauer's proposed construction and instead construe "[support structure] of the handgun" according to its plain and ordinary meaning, including both integral support structures and support structures attached via a bracket.

D.    "Telescopically receivable by said passage"

Proposed Constructions:

| Sig Sauer | "Removably longitudinally insertable within said passage" |
|-----------|----------------------------------------------------------|

| NST | No construction necessary; plain and ordinary meaning |
|-----|-------------------------------------------------------|

Next, the parties' disagreement over the term "telescopically receivable by said passage," is focused on whether the term "telescopically receivable" encompasses not only the concept of insertability but also removability. NST argues that it does not, and thus the patent only requires that the support structure be receivable by the passage, without necessarily being removable. Doc. 98 at 12. Sig Sauer, in turn, argues that the term "plainly connotes insertable movement into the passage, and thus removability" and proposes that the term be construed as "removably longitudinally insertable within said passage."[3] Doc. 96 at 16. I agree with Sig Sauer that "telescopically receivable" connotes both insertability and removability.

Beginning with the intrinsic evidence, the term "telescopically receivable by said passage" is used throughout the claims to describe how the

---

[3]     Sig Sauer also argues that the asserted claims are indefinite because the "plain and ordinary meaning of 'telescopic' cannot be reconciled" with the Patents' claims, which, Sig Sauer contends, only encompass support structures that "can be inserted or removed from the passage," not those that are "extensible or compressible." Doc. 99 at 14; see also Doc. 96 at 16-18. However, the Federal Circuit has "not endorsed a regime in which validity analysis is a regular component of claim construction." Phillips, 415 F.3d at 1327; see also Nautilus, Inc. v. Biosig Instruments, Inc., 572 U.S. 898, 901 (2014) (noting that indefiniteness is a grounds for invalidating a patent). Thus, I defer the issue of indefiniteness to the summary judgment stage. See, e.g., DuraSystems Barriers Inc. v. Van-Packer Co., No. 1:19-cv-01388, 2021 WL 4037826, at *5-7 (C.D. Ill. Sept. 3, 2021).

support structure of the handgun interacts with the passage of the stabilizing

attachment so as to secure the two pieces together. '444 Patent col. 6 ll. 6-7,

col. 6 ll. 37-38, 59-61; '021 Patent col. 6 ll. 19-20. This language comports with

the term's usage throughout the Patents' abstracts, summaries, and

specifications. See '444 Patent col. 1 ll. 55-57, 66-67, col. 3 ll. 48-51, col. 5 ll.

14-17, 29-33; '021 Patent col. 1 ll. 59-60, col. 3 ll. 56-59, col. 5 ll. 21-24, 36-40.

Neither party presents any persuasive argument as to the meaning of

"telescopically receivable" based on this intrinsic evidence, nor does either

party present any evidence as to how a person of ordinary skill in the art

would understand the term. See Doc. 98 at 14 (NST stating, without

elaboration, that "telescopic" is "specific and well known" to a person of

ordinary skill in the art). Instead, the parties focus their analysis on extrinsic

evidence, namely, dictionary definitions. See Vitronics Corp., 90 F.3d at 1576

n.6 (explaining that judges may rely on dictionary definitions during claim

construction "so long as the dictionary definition[s] do[] not contradict any

definition found in or ascertained by a reading of the patent documents").

The parties cite numerous definitions of "telescopically" that do not

materially differ. For example, NST defines "telescopically" as "[b]y sliding

one part into or out of another, in the manner of the sliding tubes of an

extendable hand-held telescope," Doc. 97-16 at 2, and the related term,

"telescopic," as "[e]xtensible or compressible by or as if by the sliding of

overlapping sections," Doc. 97-17 at 9. Similarly, Sig Sauer defines "telescopic" as "having the power of movement (as extension) by joints sliding one within another like the tube of a hand telescope." Doc. 96-13 at 4. These definitions make clear that "telescopically" incorporates a dynamic relationship between two or more concentric components such that one component is able to slide within another.[4] Accordingly, "telescopically," on its own, certainly incorporates receivability and removability.

Turning to "receivable," the parties do not appear to contest its definition, which generally means "capable of being received." Receivable, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/receivable [https://perma.cc/4ZT9-P9BF]. "Received" is then the past participle of "receive," which is, in turn, defined as "to come into possession of" or "to act as a receptacle or container for." Receive, MERRIAM-WEBSTER DICTIONARY, https:/www.merriam-

---

[4]     The dictionary definitions cited by NST provide that for two pieces to relate telescopically, one part must slide "into or out of" another part such that they are "extensible or compressible." While "or" is often used disjunctively to denote one or the other, after considering commonplace examples of telescopic objects—such as the hand-held telescope referred to in both parties' cited definitions—it is clear that, under normal circumstances, the movement of telescopic components is bidirectional. See Pulsifer v. United States, 601 U.S. 124, 149 (2024) (describing the meanings of "and" and "or" as "context-dependent"). Accordingly, the best reading of the word "or" as used in the cited dictionary definitions is as a conjunction, meaning both.

webster.com/dictionary/receive [https://perma.cc/P68K-DNBG]. Accordingly,

on its own, "receivable" describes the structural relationship between the two

components, with the passage acting as the receptacle for the support

structure.

Thus, at bottom, the parties' disagreement is focused on how the words

"telescopically" and "receivable" function in tandem. NST argues that "[j]ust

because a part can be received by another part, does not require it be

removable." Doc. 98 at 12. Though this argument has surface appeal, upon

further analysis, it cannot withstand scrutiny. As the adverb describing

"receivable," "telescopically" describes how the support structure must be

received by the passage—by sliding within, that is, into and out of, the

passage. See Anchor Wall Sys., Inc. v. Rockwood Retaining Walls, Inc., 340

F.3d 1298, 1311 (Fed. Cir. 2003) (explaining that the term "generally

parallel" "expressly ties the adverb 'generally' to the adjective 'parallel'" such

that the "ordinary meaning of the phrase . . . envisions some amount of

deviation from exactly parallel"). Thus, the term "telescopically receivable"

connotes both the concepts of insertability and removability.

NST resists this construction and argues that the specification

contemplates the support structure being receivable but not removable. First,

it cites an embodiment in which the support structure is "frictionally retained

within [the] passage" and language stating that "other means of restraining

the withdrawal of the buffer tube from the passage could be employed." Doc. 98 at 13 (quoting '444 Patent col. 3 ll. 62-65). However, the claims themselves include no such limitations, and accordingly, to read in such a limitation would be to limit the invention to a preferred embodiment, which, again, the Federal Circuit has "repeatedly cautioned against." Williamson, 792 F.3d at 1346-47 (cleaned up).

Second, NST argues that the patent describes the user's forearm as being "removably receivable," thereby emphasizing that the patentee understood "removability" and "receivability" as distinct concepts. Doc. 98 at 12-13 (quoting '444 Patent col. 6 ll. 62-63, col. 7 ll. 2-3). However, the term "removably receivable" does not encompass the concept of "telescopically," and thus this argument overlooks the bidirectional, concentric movement encompassed by the adverb.

Accordingly, with one small exception, I adopt Sig Sauer's proposed construction, which incorporates both the concepts of insertability and removability. However, because the claim language already describes the passage as "longitudinally extending" within the upper portion of the body, the support structure is limited to longitudinal sliding, rendering "longitudinally" unnecessary in this construction.

Thus, for the aforementioned reasons, I construe the term

"telescopically receivable by said passage" to mean "removably insertable

within said passage."

E.     "Body"

Proposed Constructions:

| Sig Sauer | "[A] single, unitary forearm stabilizing attachment" |
|-----------|------------------------------------------------------|
| NST | No construction necessary; plain and ordinary meaning |

The parties disagree over whether the term "body" connotes a "unitary"

component, as Sig Sauer contends, Doc. 96 at 24, or can be comprised of

multiple components, as NST argues, Doc. 98 at 19.[5] I agree with NST.

The term "body" is described in the claims as "having a front end, a

rear end, an upper portion, a lower portion, and a passage longitudinally

extending within said upper portion and at least through said front end of

said body." See, e.g., '444 Patent col. 6 ll. 3-7. Thus, the term "body" is used,

as NST correctly notes, to denote the main portion of the stabilizing

---

[5]     Sig Sauer argues in its opening brief that the term "body" must also be
a "single" component. Doc. 96 at 24. In its response brief, however, it appears
to have stepped back from that argument and asserts that the "fundamental
dispute between the parties . . . [is] whether the claim structure 'body' refers
to a 'unitary' part as recited in the specification and drawings or can refer to
multiple parts." Doc. 99 at 21-22. Though it is not completely clear whether
Sig Sauer has, in fact, abandoned its singularity argument, because I
conclude that the body can be comprised of multiple components attached
together so as to form a unitary body, I need not consider the matter further.

attachment, that is, the portion of the stabilizing attachment excluding the strap. This comports with the dictionary definition of "body," which is defined as "the main, central, or principal part," such as the enclosed part of an automobile, or "a mass of matter distinct from other masses," such as a body of water.[6] Body, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/body [https://perma.cc/BRA7-RWLL]; see also Doc. 96-16 at 4; Doc. 97-17 at 5. Neither of these definitions, however, require that the body be comprised of just one component. In fact, the opposite is likely true. For example, the body of a car is generally, if not always, manufactured in separate pieces (e.g., the frame, doors, and roof) and assembled into a single structure.

Moreover, although the specification of the '444 Patent refers to the body as "unitary," '444 Patent col. 3 l. 40, it also explicitly contemplates the body comprising "various components of the body [that] are of different materials," thus supporting NST's position, id. col. 4 ll. 24-31 (describing the upper portion being "formed of a rigid or non-elastomeric material" and the lower portion being "formed of a resilient material").

---

[6]   Neither party has presented any evidence that a person of ordinary skill in the art would define the term "body" differently from these dictionary definitions.

Accordingly, I decline to adopt Sig Sauer's proposed construction and construe the term "body" according to its plain and ordinary meaning.

F.    "Bifurcated so as to define a pair of spaced flaps"

Proposed Constructions:

| | |
|---|---|
| Sig Sauer | "Portion of the single, unitary forearm stabilizing attachment which branches into two flaps" |
| NST | No construction necessary; plain and ordinary meaning |

The '444 Patent describes the lower portion of the body as being "bifurcated so as to define a pair of spaced flaps" between which the user's forearm is received. See, e.g., id. col. 6 ll. 8-11. In offering its proposed construction, Sig Sauer seeks to (1) read the term "body" as a "single, unitary forearm stabilizing attachment" and (2) further define "bifurcated." As an initial matter, for the same reasons I have previously mentioned, I reject Sig Sauer's proposed construction of the term "body" and decline to incorporate that definition here.

Turning now to "bifurcated," Sig Sauer argues that this is an "uncommon enough" word so as to warrant additional construction. Doc. 96 at 28. NST does not address this point directly, and I agree that some members of the jury who may be called upon to decide this case may not be familiar with the term. Thus, I will give the term "bifurcated" its usual meaning—

32

divided or separated into two parts—which comports with both parties' cited

definitions. See Doc. 97-20 at 2 (NST's cited dictionary definition, defining

"bifurcate" as "to divide or fork into two branches"); Doc. 96-23 at 4 (Sig

Sauer's cited dictionary definition, defining "bifurcate" as "to branch or

separate into two parts").

Accordingly, I construe "bifurcated so as to define a pair of spaced

flaps" as "divided or separated so as to define a pair of spaced flaps."

G.   "Said lower portion having at least one flap extending from
said upper portion"

<u>Proposed Constructions:</u>

| Sig Sauer | "A flap of the lower portion originating where the lower portion meets the upper portion," |
|-----------|---------------------------------------------------------------------------------|
| NST | No construction necessary |

Next, Sig Sauer argues that the term "said lower portion having at

least one flap extending from said upper portion," as included in claim 1 of

the '021 Patent, should be construed as "a flap of the lower portion

originating where the lower portion meets the upper portion."[7] Doc. 96 at 33.

---

[7]   Sig Sauer also argues that this term is indefinite because the "location
of the flap is not informed with reasonable certainty." Doc. 96 at 33. However,
as I have explained, courts generally elect to defer validity analysis to the
summary judgment stage of litigation. See Phillips, 415 F.3d at 1327.

This construction, Sig Sauer suggests, "sets a definite location of the 'at least one flap.'" Id. at 35. I, however, find this construction overly limiting for two reasons.

First, the claim language recites that the "at least one flap" "extend[s]" from the upper portion of the body. Though "extend" is not defined in the patent, and neither party attempts to define it according to a person of ordinary skill in the art, the ordinary dictionary definition of the word means "to spread or stretch forth." Extend, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/extend [https://perma.cc/B6MG-74A4]. Accordingly, the "at least one flap" need only spread or stretch forth from the upper portion of the body, that is, somewhere in the upper portion. It is not required to "always originate" from where the lower portion meets the upper portion, as Sig Sauer contends. Doc. 96 at 36.

Sig Sauer defends this construction by citing to an embodiment in the specification describing the flaps as being bifurcated from the lower portion of the body. Id. However, while the "at least one flap" may certainly extend from the precise boundary between the upper and lower portions of the body, to limit the claim language to a single preferred embodiment would be inappropriate. See Williamson, 792 F.3d at 1346-47.

Second, Sig Sauer seeks to replace "at least one flap" with "a flap." As I have noted, Sig Sauer is correct that patent law generally treats "a" to mean

"one or more," and thus "a" and "at least one" are effectively synonymous. See TiVo, Inc., 516 F.3d at 1303. However, Sig Sauer fails to provide any persuasive reasoning as to why a person of ordinary skill in the art would not understand the term "at least one" or how replacing it with "a" would provide any clarification.

Therefore, in sum, I decline to adopt Sig Sauer's proposed construction and construe the term "[a] flap of the lower portion originating where the lower portion meets the upper portion" according to its plain and ordinary meaning.

## H. "Elastomeric material"

Proposed Constructions:

| Sig Sauer | "A material with elastic properties" |
| NST | "To be made of an elastomer" |

Lastly, the parties disagree as to whether the term "elastomeric material" refers to materials with elastic properties or a specific category of materials known as elastomers. Sig Sauer advocates for the former construction, arguing that "elastomeric" is used throughout the specification to "describe[e] the properties of the material," in particular, "the polymer-like quality of being resilient, or able to return to its original shape after being stressed." Doc. 96 at 30-31 (asserting that "the specification equates

'elastomeric,' . . . to 'semi-rigid' and 'resilient' materials, while equating 'non-elastomeric' to 'rigid'"). NST, in turn, argues for the latter construction because "the elastic properties of an elastomer are more specific than just 'elastic'" and, during prosecution, the claims were narrowed from encompassing "resilient" materials to "elastomeric materials." Doc. 98 at 23. I agree with NST.

"Elastomeric material" is not defined in the patent. Instead, the parties rely on several dictionary definitions, which, though differing to some degree, demonstrate that "elastomeric" cannot be strictly limited to simply "elastic" or "resilient" materials, as Sig Sauer contends. For example, Sig Sauer offers several definitions of "elastomer" that connote elasticity "akin to those of rubber." See e.g., Doc. 96-28 at 4; Doc. 96-29 at 5. Similarly, the definitions provided by NST describe "elastomeric" as "[a]ny of various polymers having the elastic properties of natural rubber." Doc. 97-17 at 7. Accordingly, these definitions distinguish "elastomeric" materials from numerous other materials, such as certain metals, that might exhibit some degree of elasticity or resiliency under certain conditions.

This distinction between "elastomeric" materials and merely elastic or resilient materials is also evident in the patent history of the '444 Patent. During prosecution, the examiner rejected claim 2 (then identified as claim 10) as being unpatentable over U.S. Patent No. 4,196,742 for obviousness.

Doc. 97-4 at 38. The examiner explained that '[i]t would have been obvious to one having ordinary skill in the art at the time the invention was made to utilize a resilient material." Id. It further explained:

> Although these elements, 'elastomeric' and 'non-elastomeric,' are found as examples or embodiments in the specification, they were not claimed explicitly. Nor were the words that are used in the claims defined in the specification to require these limitations. A reading of the specification provides no evidence to indicate that these limitations must be imported into the claims to give meaning to disputed terms. Therefore, examiner cannot and will not include such alleged 'limitations' in the interpretation of the claims.

Id. at 75. In response, NST amended the claim to replace "a resilient" material with "an elastomeric" material. Id. at 86. This history not only emphasizes the distinction between these two terms but also confines the parties to this narrower construction. See Microsoft Corp. v. Multi-Tech Sys., Inc., 357 F.3d 1340, (Fed. Cir. 2004) ("We cannot construe the claims to cover subject matter broader than that which the patentee itself regarded as comprising its inventions and represented to the PTO.")

This narrower construction also comports with PTAB's final written finding after full briefing, Doc. 75-1 at 18-22; Doc. 75-2 at 18-22, which I find persuasive, as well as the testimony of one of NST's expert witnesses, who opined during the IPR that "the ordinary meaning of the term 'elastomer' or 'elastomeric material' refers to a rubber-like polymer with a large range of

elastic deformation and low rigidity."[8] Deposition Transcript of Joshua C. Harrison, Ph.D., dated November 19, 2020 at 71-72, Sig Sauer Inc. v. NST Global, LLC, No. 2020-00423 (PTAB 2021).

Thus, I construe "elastomeric material" to mean "made of an elastomer."

## CONCLUSION

For the foregoing reasons, with respect to U.S. Patent No. 8,869,444 and U.S. Patent No. 9,354,021:

A) the preamble is limiting;

B) "support structure" is a means-plus-function term where the function is "being telescopically receivable" and the corresponding structures are "a buffer tube" or "tubular member" and their equivalents;

C) "[support structure] of the handgun" is accorded its plain and ordinary meaning, including both integral support structures and support structures attached via a bracket;

---

[8]     Although NST has not submitted the deposition testimony of its expert witness in this case, "pursuant to Rule 201(b)(2) of the Federal Rules of Evidence, [a court] may take judicial notice" of filings made before PTAB. VirtualAgility Inc. v. Salesforce.com, Inc., 759 F.3d 1307, 1312-13 (Fed. Cir. 2014).

D) "telescopically receivable by said passage" means "removably insertable within said passage";

E) "body" is accorded its plain and ordinary meaning;

F) "bifurcated so as to define a pair of spaced flaps" means "divided or separated so as to define a pair of spaced flaps";

G) "said lower portion having at least one flap extending from said upper portion" is accorded its plain and ordinary meaning;

H) "elastomeric material" means "made of an elastomer."

SO ORDERED.

/s/ Paul J. Barbadoro
Paul J. Barbadoro
United States District Judge

August 16, 2024

cc:   Counsel of Record