## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW HAMPSHIRE

**NST Global, LLC, d/b/a SB Tactical**

   v.                                              Case No. 1:19-cv-792-PB
                                                  Opinion No. 2026 DNH 053
**SIG Sauer Inc.**


## MEMORANDUM AND ORDER

NST Global, LLC filed this patent-infringement action, alleging that Sig Sauer Inc.'s pivoting contour brace ("PCB") infringes two of its patents: U.S. Patent No. 8,869,444 ("the '444 Patent") and U.S. Patent No. 9,354,021 ("the '021 Patent). In a previous order, I construed eight disputed patent terms on which NST's infringement claims are based. Doc. 106.

The parties then agreed to post-claim construction discovery limited to liability issues and exchanged final infringement contentions and final invalidity contentions pursuant to New Hampshire Supplemental Patent Rules ("SPR") 7.1(a) and (b). Doc. 109 at 1. Following those exchanges, Sig Sauer moved for summary judgment. Doc. 114. It argues that its accused products do not infringe any of the asserted patent claims, either literally or under the doctrine of equivalents. Doc. 114-1.

# I.  BACKGROUND

## A.    The Patents

The '444 Patent and the '021 Patent disclose "a forearm-gripping stabilizing attachment for a handgun that secures the rearward end of [a] handgun frame and engages a user's forearm." '444 Patent col. 1 ll. 16-20. The stabilizing attachment is designed to aid a handgun user in steadying a gun while firing, especially when the user shoots using only one hand. '444 Patent col. 1 ll. 13-17; '021 Patent col. 1 ll. 16-20.

The stabilizing attachment includes "a body having a front end, a rear end, an upper portion [and] a lower portion." '444 Patent col. 6 ll. 3-5, '021 Patent col. 2 ll. 2-4. The body also includes "a passage longitudinally extending within said upper portion and at least through the front end of said body, the support structure of the handgun being telescopically receivable by said passage." '444 Patent col. 1 ll. 53-57; '021 Patent col. 1 ll. 55-60. One embodiment of the '444 Patent shows a side elevation view of how the support structure of a handgun (62) is "telescopically receivable" within the passage (24) of the body (14) of the forearm-gripping stabilizing attachment (10) at Figure 7. '444 Patent (fig. 7). Figure 7 is reproduced below.[1]

---

[1]    An identical drawing is included in the '021 Patent as Figure 7. '021 Patent (fig. 7).



FIG. 7

Id.

The '444 Patent also claims that the lower portion of the stabilizing attachment's body is "bifurcated so as to define a pair of spaced flaps" such that a user's forearm can be received between those two flaps. '444 Patent col. 6 ll. 8-11. One embodiment of the '444 Patent shows both a side (fig. 1) and rear (fig. 2) view of how the lower portion of the "body" (10) bifurcates into a pair of spaced flaps (22 and 32) that wrap around a user's forearm (34).



FIG. 1



FIG. 2

'444 Patent (figs. 1, 2).

3

## B.    Procedural Background

NST filed its '444 and '021 Patents in 2012 and 2014, respectively. Doc. 97 at 7. Shortly thereafter, Sig Sauer became the exclusive distributor and licensee of NST's forearm-stabilizing attachment. Id. But in 2018, NST discovered that Sig Sauer had developed its own stabilizing attachment for a handgun, the PCB. Id. NST filed suit against Sig Sauer for direct infringement of the patents, as well as induced and contributory infringement of the '444 Patent. Doc. 1 at 9-12. The PCB and Sig Sauer's associated products, all of which incorporate the PCB, are the "accused products" in the present action. [2]

About a year after NST filed its infringement action, Sig Sauer brought two petitions for inter partes review before the Patent and Trademark Appeals Board ("PTAB"). Doc. 68-3; Doc. 68-4. After the PTAB resolved the petitions, NST's only remaining claims are for infringement of claims 2, 11, and 12 of the '444 Patent, all three of which depend on claims 1 and 10 of the '444 Patent, and claim 2 of the '021 Patent, which depends on claim 1 of the

---

[2]    In its complaint and revised final infringement contentions, NST includes claim charts for seven distinct "accused products." Each of these seven incorporate the PCB, and NST only contends that the PCB component of each accused product is infringing. NST does not contend that any other component of the accused products infringes the '444 or '021 Patents. I thus only discuss infringement by the PCB.

'021 Patent. Doc. 96 at 8. NST still contends that the accused products directly infringe the remaining claims of the '444 and '021 Patents under 35 U.S.C. § 271(a). Doc. 114-8 at 4. It also asserts that the PCB infringes the '444 Patent by induced infringement under 35 U.S.C. § 271(b), contributory infringement under 35 U.S.C. § 271(c), and infringement through exportation under 35 U.S.C. § 271(f). Id. at 4-5.

The parties disputed the proper construction of eight terms contained within the remaining claims. Doc. 106 at 2. I reproduce those claims and their disputed terms (underlined) below.

<u>Claim 1 of the '444 Patent</u>

What is claimed is:
1. <u>A forearm-gripping stabilizing attachment for a handgun, the handgun having a support structure extending rearwardly from the rear end of the handgun, the forearm-gripping stabilizing attachment</u>, comprising:
    a <u>body</u> having a front end, a rear end, an upper portion, a lower portion, and a passage longitudinally extending within said upper portion and at least through said front end of said body, the <u>support structure of the handgun</u> being <u>telescopically receivable by said passage</u>;
    said lower portion being <u>bifurcated so as to define a pair of spaced flaps</u> between which a user's forearm is received when securing the stabilizing attachment to the user's forearm; and
    a strap connected to said body, said strap securing said spaced flaps to retain the user's forearm between said spaced flaps when the stabilizing attachment is secured to a user's forearm.

'444 Patent col. 5 ll. 65-67, col. 6 ll. 1-2.

<u>Claim 2 of the '444 Patent</u>

2. The forearm-gripping stabilizing attachment of claim 1, wherein said spaced flaps are constructed of an <u>elastomeric material</u> and at least partially

conform to and grip a user's forearm when the user's forearm is disposed between said spaced flaps.

Id. col. 6 ll. 17-21.

## Claim 10 of the '444 Patent

10. A forearm-gripping stabilizing attachment for a handgun, the handgun having a support structure extending rearwardly from the rear end of the handgun, the forearm-gripping stabilizing attachment, comprising:
    a body having a passage longitudinally extending therein and at least through a front end of said body, the support structure of the handgun being telescopically receivable by said passage;
    said body defining a space within which a user's forearm is removably receivable;
    a strap connected to said body, said strap preventing withdrawal of a user's forearm from said space when the forearm gripping stabilizing attachment is secured to the user's forearm; and
    wherein said body is bifurcated and defines a pair of spaced flaps, said pair of spaced flaps is defining said space within which the user's forearm is removably receivable.

Id. col. 6 ll. 54-67, col. 7 ll. 1-3.

## Claim 11 of the '444 Patent

11. The forearm-gripping stabilizing attachment of claim 10, wherein said pair of spaced flaps are constructed of an elastomeric material.

Id. col. 7 ll. 4-6.

## Claim 12 of the '444 Patent

12. The forearm-gripping stabilizing attachment of claim 11, wherein said pair of spaced flaps at least partially conform to a user's forearm when the user's forearm is disposed between said pair of space flaps.

Id. col. 7 ll. 7-10.

<u>Claim 1 of the '021 Patent</u>

What is claimed is:

1. <u>A forearm-gripping stabilizing attachment for a handgun, the handgun having a support structure extending rearwardly from the rear end of the handgun, the forearm-gripping stabilizing attachment</u>, comprising:

a <u>body</u> having a front end, a rear end, an upper portion, a lower portion, and a passage longitudinally extending within said upper portion and at least through said front end of said body, the <u>support structure of the handgun being telescopically receivable by said passage</u>;

<u>said lower portion having at least one flap extending from said upper portion</u>;

a strap connected to said body, said strap securing said at least one flap to a user's forearm when the stabilizing attachment is secured to a user's forearm; and

wherein said passage extends entirely through said body between said front end and said rear end of said body.

'021 Patent col. 6 ll. 11-15.

<u>Claim 2 of the '021 Patent</u>

2. The forearm-gripping stabilizing attachment of claim 1, wherein said at least one flap is constructed of an <u>elastomeric material</u>.

Id. col. 6 ll. 28-30.

In my claim construction order, I construed the disputed terms as follows:

> [T]he **preamble** is limiting [to the extent of "the handgun having a support structure extending rearwardly from the rear end of the handgun"];

> **"support structure"** is a means-plus-function term where the function is "being telescopically receivable" and the corresponding structures are "a buffer tube" or "tubular member" and their equivalents;

7

**"[support structure] of the handgun"** is accorded its plain and ordinary meaning, including both integral support structures and support structures attached via a bracket;

**"telescopically receivable by said passage"** means "removably insertable within said passage";

**"body"** is accorded its plain and ordinary meaning;

"**bifurcated so as to define a pair of spaced flaps**" means "divided or separated so as to define a pair of spaced flaps";

**"said lower portion having at least one flap extending from said upper portion"** is accorded its plain and ordinary meaning;

**"elastomeric material"** means "made of an elastomer."

Doc. 106 at 38-39 (citation modified) (emphasis added).

Following claim construction, the parties assented to a joint discovery plan and exchanged final infringement contentions and final invalidity contentions pursuant to SPR 7.1(a) and (b). Doc. 109 at 1. After discovery was completed, Sig Sauer moved for summary judgment. Doc. 114.

## II.  STANDARD OF REVIEW

Summary judgment is appropriate when the record reveals "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Tang v. Citizens Bank, N.A., 821 F.3d 206, 215 (1st Cir. 2016). In this context, a "material fact" is one that has the "potential to affect the outcome of the suit." Cherkaoui v. City of Quincy, 877 F.3d 14, 23 (1st Cir. 2017) (quoting Sánchez v. Alvarado, 101 F.3d 223, 227 (1st Cir. 1996)). A "genuine dispute" exists if a factfinder could resolve the

8

disputed fact in the nonmovant's favor. Ellis v. Fid. Mgmt. Tr. Co., 883 F.3d 1, 7 (1st Cir. 2018).

The movant bears the initial burden of presenting evidence that "it believes demonstrate[s] the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); accord Irobe v. U.S. Dep't of Agric., 890 F.3d 371, 377 (1st Cir. 2018). Once the movant has properly presented such evidence, the burden shifts to the nonmovant to designate "specific facts showing that there is a genuine issue for trial," Celotex, 477 U.S. at 324, and to "demonstrate that a trier of fact could reasonably resolve that issue in [its] favor," Irobe, 890 F.3d at 377 (alteration in original) (quoting Borges ex rel. S.M.B.W. v. Serrano-Isern, 605 F.3d 1, 5 (1st Cir. 2010)). If the nonmovant fails to adduce such evidence on which a reasonable factfinder could base a favorable verdict, the motion must be granted. Celotex, 477 U.S. at 324. In considering the evidence, I must draw all reasonable inferences in the nonmoving party's favor. Theriault v. Genesis HealthCare LLC, 890 F.3d 342, 348 (1st Cir. 2018).

### III.  ANALYSIS

Sig Sauer challenges NST's infringement claims on three grounds.[3] First, it contends that the PCB does not literally infringe either patent because it does not have a support structure that is "telescopically receivable" by the passage within its body. Sig Sauer next claims that NST forfeited its alternative argument that the "telescopically receivable" claim limitation is satisfied for both patents under the doctrine of equivalents because NST failed to properly disclose that theory in its final invalidity contentions. Finally, Sig Sauer asserts that the PCB does not infringe the '444 Patent because the spaced flaps in the lower portion of the PCB's body are not "bifurcated." I address each argument in turn.

### A.  "Telescopically Receivable"—Literal Infringement

The parties first disagree over whether the "telescopically receivable" claim limitation is literally present in the PCB. NST supports its contention that the limitation is found in the PCB with two sets of diagrams in its final infringement contentions that depict the PCB from different vantage points.

---

[3]    To the extent Sig Sauer challenges NST's claims of induced and contributory infringement, it does so only in a footnote, contending that these "claims fail for the same reason as [its direct infringement claims], since there can be no indirect infringement without direct infringement." Doc. 114-1 at 13 n. 6. Sig Sauer does not challenge NST's claims under 35 U.S.C. § 271(f). Because the parties do not brief these claims in more detail, I do not analyze them separately.

The first two diagrams show a "passage (I) longitudinally extending within said upper portion (G) at least through the front end (E) of said body (D)." Doc. 114-8 at 11.



Id. NST then points to two additional diagrams to show what it claims is "the support structure (C) of the handgun (B) being telescopically receivable by said passage (I)." Id. at 12.



Id.

Sig Sauer responds by focusing on my construction that "telescopically receivable" means "removably insertable within said passage." In its view, a handgun's support structure cannot be "removably insertable" within the passage of the PCB's body because the support structure is attached to the body by a washer, screw, and fastening cap. As a result, Sig Sauer argues, the handgun's support structure cannot be made removable from the PCB's passage without removing the cap and loosening the screw, a modification that Sig Sauer claims prevents the structure from being removably insertable.

NST replies by arguing that the "telescopically receivable" element is present in the PCB because: (1) the limitation is cast in terms of capability; (2) the PCB has that capability; and (3) the capability is enabled by removing the fastening cap and loosening the screw that attaches the support structure to the PCB's body by hand without otherwise altering the device.

To resolve this dispute, I first review the legal standard that determines the issue and then assess the evidence NST identifies to support its position.

1.   <u>Legal Standard</u>

The Federal Circuit has explained on multiple occasions how a court should address a claim that an accused device infringes an opponent's patent because of a latent capability. On the one hand, it has repeatedly rejected the notion that "infringement may be based upon a finding that an accused product is merely capable of being modified in a manner that infringes the claims of a patent." Fantasy Sports Props., Inc. v. Sportsline.com, Inc., 287 F.3d 1108, 1117-18 (Fed. Cir. 2002); see also INVT SPE LLC v. Int'l Trade Comm'n, 46 F.4th 1361, 1376 (Fed. Cir. 2022); Telmac Cellular Corp. v. Topp Telecom, Inc., 247 F.3d 1316, 1330 (Fed. Cir. 2001). On the other hand, the court has recognized that where a claim term recites a capability, "an accused device may be found to infringe if it is reasonably capable of satisfying the claim limitations, even though it may also be capable of non-infringing modes of operation." Hilgraeve Corp. v. Symantec Corp. 265 F.3d 1336, 1343 (Fed. Cir. 2001); see also Intel Corp. v. U.S. Int'l Trade Comm'n, 946 F.2d 821, 832 (Fed. Cir. 1991); Fantasy Sports, 287 F.3d at 1117-18; Finjan, Inc. v. Secure Computing Corp., 626 F.3d 1197, 1204-05 (Fed. Cir. 2010). What matters in such cases is whether the accused device is reasonably capable of satisfying

the claim limitation without significant modification. INVT, 46 F.4th at 1376; ParkerVision, Inc. v. Qualcomm Inc., 903 F.3d 1354, 1362 (Fed. Cir. 2018); Ericsson, Inc. v. D-Link Sys., Inc., 773 F.3d 1201, 1217 (Fed. Cir. 2014); VLSI Tech. LLC v. Intel Corp., No. 24-1772, slip op. at 8 (Fed. Cir. Apr. 14, 2026).

Without distinguishing these two lines of authority, Sig Sauer argues that the result in this case is dictated by the Federal Circuit's decision in High Tech Medical Instrumentation, Inc. v. New Image Industries, Inc., 49 F.3d 1551, 1555 (Fed. Cir. 1995). I disagree. As I explain in detail below, High Tech is inapplicable here because the claim limitation at issue in that case was a structural limitation, whereas the "telescopically receivable" limitation recites a capability rather than a structure. Accordingly, the test for determining whether the limitation reads on the PCB asks whether the PCB is reasonably capable of performing the claim limitation without significant modification.

High Tech examined whether the fact that a product could be modified for use in an infringing matter is enough to find literal infringement. 49 F.3d at 1555. There, the claim was directed at a dental endoscope, "comprising a body member and a camera disposed in the body member, with the camera 'being rotatably coupled to said body member.'" Revolution Eyewear, Inc. v. Aspex Eyewear, Inc., 563 F.3d 1358, 1369 (Fed. Cir. 2009) (citing High Tech, 49 F.3d at 1552). Users had to loosen a set of screws in order for the accused

device to be "rotatably coupled to the body member" and thus meet the claim limitation. High Tech, 49 F.3d at 1555-56. The Federal Circuit held that showing that the accused device could be modified to meet the claim limitation was insufficient, on its own, to prove infringement. Id. The court explained that "a device does not infringe simply because it is possible to alter it in a way that would satisfy all the limitations of a patent claim." Id. at 1555. Accordingly, it reversed the district court's decision to grant the plaintiff's request for a preliminary injunction. Id. at 1558.

In reaching this conclusion, the court took pains to distinguish Intel, the seminal case that deals with capability claiming. Id. at 1555-56. In Intel, the patent disclosed a claim for "programmable selection means for selecting alternative addressing modes." Intel, 946 F.2d at 831. There, the court held that "[b]ecause the language of claim 1 refers to 'programmable selection means' . . . the accused device, to be infringing, need only be capable of operating in the page mode," adding that "actual page mode operation in the accused device is not required." Id. at 832.

More recently, in Revolution Eyewear, the court expressly distinguished High Tech from cases dealing with capability claims by noting that "the claim in High Tech requires a structure: a camera 'rotatably coupled' to a body member. In contrast, [the claim at issue] only requires a capacity to perform a function: 'capable of engaging' magnetic members." 563

F.3d at 1369. When read together, these cases leave no doubt that High Tech does not control when assessing claims drawn to capability.

In the case before me, I agree with NST that the "telescopically receivable" claim limitation is drawn to capability. Like the claim limitation at issue in Intel, which involved a "programmable selection means," Intel, 946 F.2d at 832, the limitation at issue here requires that the support structure be "telescopically receivable" by the passage in the body of the device. Both limitations are thus drawn to capability. See Fogg Filler Co. v. Closure Sys. Int'l Inc., 454 F. Supp. 3d 693, 699-700 (W.D. Mich. 2020); (applying Intel, not High Tech, where claim limitation required product to be "rotatable" and "translatable" (emphasis added)); cf. Cross Med. Prods., Inc. v. Medtronic Sofamore Danek, Inc., 424 F.3d 1293, 1311 (Fed. Cir. 2005) (applying High Tech, not Intel, where "the claim does not require that the interface be merely 'capable' of contacting bone" but rather "the claim has a structural limitation that the anchor seat be in contact with bone"). And because the limitation is drawn to capability, what matters in determining infringement is whether the handgun's support structure is reasonably capable of being telescopically receivable within the passage of the PCB without significant alteration.

2.    <u>Evidence</u>

Having determined that this issue must be analyzed using the "reasonably capable" standard, I assess the evidence in the light most favorable to NST to determine whether a reasonable jury could conclude that the standard has been met. To begin with, as NST points out, "[d]irect infringement has no intent element and for an 'accused device to be infringing, it need only be capable of operating' in the infringing manner." Sorrell Holdings, LLC v. Infinity Headwear & Apparel, LLC, 2024 WL 413432, at * 3 (Fed. Cir. Feb. 5, 2024) (quoting Intel, 946 F.2d at 832) (citation modified). Further, it is indisputable that the support structure of the handgun is capable of being removed from the passage in the body of the PCB simply by removing the fastening cap and loosening the thumbscrew that attaches the support structure to the PCB's body. Thus, the issue to be resolved is whether the PCB must be significantly modified to enable this latent capacity.

NST points to several different types of evidence to support its contention that this issue must be resolved by a jury. First, NST identifies a statement by Sig Sauer's product manager that the PCB's brace flaps "must be removable with hand tools throughout threshold lifespan." Doc. 116-1 at 1 (SEALED). It introduces this evidence to prove that Sig Sauer itself acknowledges the "telescopically receivable" nature of the PCB.

17

NST next introduces evidence showing that the PCB's brace flaps can be, and actually have been, removed from the handgun's support structure by users. NST's expert reported he could "easily remove the brace flap portions [of the accused product] by hand, using components already present on the Accused Products." Doc. 115 at 19. He performed this removal at a gun shop "by loosening the rear thumb screw by hand with no tools," showing that the support structure of the handgun is "removable" from the PCB as assembled and sold. Doc. 115-8 at 29.

NST bolsters its evidence of removability by pointing to "several aftermarket products that exist to replace the spinning rubber [brace] flaps on the Sig PCB with a non-spinning tailhook." Id. at 30. The informational website for one of these products instructs users to "remove the factory SIG brace end (Simply unscrew it)" before replacing it with the aftermarket product. Id. at 32. NST additionally references a YouTube video in which the video creator removes a PCB from the support structure of a handgun and replaces it with an aftermarket product. Doc. 115 at 7-8. It notes that Sig Sauer incorrectly presents this video as evidence that "destructive[] dismantling" of the PCB is necessary to remove it from the support structure of the handgun; NST argues to the contrary that the video shows removability without proof of destructive dismantling, as it shows a user removing the brace flaps but does not necessarily show those flaps being

destroyed. Id. at 8. At oral argument, NST likewise referenced several videos where "the actual brace itself is removed from the back piece of the cap . . . and then another product is placed on the back of the support structure." Doc. 110 at 9-10. NST contends that the existence of these aftermarket products, which instruct users to "unscrew" the body of the PCB, and the evidence of users removing the PCB to install said aftermarket products "further support[] the removability of the PCB flap portion." Doc. 115-8 at 32.

Finally, to circumstantially show removability, NST provides evidence of Sig Sauer's design decisions. It argues that Sig Sauer elected to employ certain design elements for the purpose of enabling removal of the PCB's body from the support structure. First, NST points to the fact that Sig Sauer "pair[ed] the knurled knob with a screw to create a functional thumb screw" at the rear end of the PCB to enable removability. Doc. 115 at 19. Moreover, NST notes that Sig Sauer "omit[ed] [a] thread locker" to secure that thumbscrew, id., arguing that this omission provides further evidence of "the intended removability of the thumb screw," Doc. 115-8 at 30. And NST's expert indicates that Sig Sauer's handguns "are designed for modularity and customization," and thus "designing the brace body section [of the PCB] to be removable with a thumb-screw knob demonstrates design intent for modularity." Id. at 32-33.

Turning to insertability, NST argues that the "effortless removal" process of the PCB's brace flaps from the support structure "preserv[es] the structural integrity of the brace flaps which can be inserted once again resulting in a fully operational Accused Product." Doc. 115 at 20-21. Because removing the brace flaps of a PCB does not alter the product's structural integrity, NST argues that "[t]he brace flap portions can be put back on the support structure (support structure inserted within the passage) and the PCB is fully functional." Id. at 11 (citing Doc. 115-8 at 29); see also id. at 22 ("The Accused Products is not destroyed even with the third-party [aftermarket] product replacement given that the replacement product works on the Accused Products, and the brace flap portions can be placed back on the Accused Products.").

When this evidence is viewed in the light most favorable to NST, it is sufficient to permit a reasonable jury to conclude that the actions required to remove the PCB's brace flaps from the support structure of the handgun merely enable a latent capacity that the manufacturer intended the device to have. According to NST's evidence, enabling this latent capacity only requires actions that are reversible, nondestructive, and do not require specialized tools. That evidence is sufficient to raise a triable issue as to whether the PCB is reasonably capable of removable insertability without significant modification.

In response to NST's evidence, Sig Sauer attempts to show in multiple ways that the handgun's support structure is not "removably insertable" within the passage of the PCB. First, Sig Sauer attempts to undermine NST's evidence on "insertability." However, its efforts on this score are no more than a passing reference. Sig Sauer's only argument regarding insertability is embedded within its response to NST's Statement of Material Facts in Dispute. In response to NST's statement that "[t]he brace flap portions can be put back on the support structure (support structure inserted within the passage) and the PCB is fully functional," Sig Sauer states:

> For the purposes of its SJ Motion, SIG does not dispute [Plaintiff's Statement of Facts] 25-26 insofar as it may be technically possible to disassemble the PCB and reassemble the device. However, NST's citation does not show reassembly. Therefore, NST adduces no evidence that any customer or third-party disassembled and removed the arms/flaps from the SIG PCB for any reason other than to remove them permanently and discard them . . . .

Doc. 121 at 8. Sig Sauer makes no other substantive argument regarding insertability in either its opening brief or in its reply to NST's brief in opposition. As the First Circuit has held, "[t]he district court is free to disregard arguments not adequately developed." Higgins v. New Balance Athletic Shoe, Inc., 194 F.3d 252, 260 (1st Cir. 1999). Because Sig Sauer does not fully develop an argument regarding insertability, I cannot assess the merits of its argument.

21

More broadly, Sig Sauer makes several attempts to undermine NST's evidence that the support structure is removably insertable within the passage of the PCB, none of which are persuasive. In its only substantive effort, Sig Sauer argues that because NST's expert was only able to remove the brace flaps after receiving confidential information regarding the accused product's design, his opinion does not represent a customer's ability to remove the flaps by hand.[4] Sig Sauer argues that under Provisur Technologies, Inc. v. Weber, Inc., this kind of expert testimony cannot be used to prove infringement. See 119 F.4th 948 (Fed. Cir. 2024). Provisur is distinguishable from the current case, however. In Provisur, the expert was only able to operate the accused product in an infringing manner when provided "access to screens that [the accused product's] customers do not" have access to. Id. at 954. The court held that because "customers do not have access to the screens Provisur contends are necessary for the [accused product] to operate [in an infringing manner]," the case was "not an infringement scenario where customers can simply activate the infringing configuration." Id. at 954-55. Unlike the expert in Provisur, NST's expert did

---

[4]    Sig Sauer additionally attempts to discredit NST's expert by arguing that the expert's report cannot be used as evidence of Sig Sauer's intent for the accused products to be used in an infringing manner. However, these arguments are immaterial under Intel and the "reasonably capable" standard, which does not require proof of intent.

22

not require any tools, technologies, or devices unavailable to customers to remove the brace flaps of the PCB from the handgun's support structure; he simply unscrewed the flaps using the thumbscrew that exists within each accused product as assembled and sold. Therefore, NST's expert was merely "activating means that are already present in the underlying [product]," and his testimony raises a triable issue of fact as to whether a customer could likewise remove the PCB's brace flaps from the handgun's support structure using the accused product's thumbscrew. Fantasy Sports, 287 F.3d at 1118 (citation modified). Provisur is thus inapposite and does not undermine the testimony of NST's expert on removability.[5]

Based on the foregoing, I conclude that NST has identified sufficient evidence to raise a genuine dispute of material fact as to whether a

---

[5] Sig Sauer also makes a procedural argument that NST impermissibly "sand-bagg[ed]" Sig Sauer by introducing new infringement theories on removability through its expert report. Doc. 121 at 22. This argument is unavailing. SPR 7.1(a) requires the party asserting infringement to serve its final infringement contentions, including "the party's final statement of all contentions required by SPR 5.1(a)," and NST did so here. See Doc. 114-8. The rules do not require production of evidentiary support for the contentions at the contention stage. NST's claim chart, produced in tandem with its final infringement contentions, sufficiently identifies how the accused products meet the "telescopically receivable" claim limitation. See Doc. 114-8 at 12-13. The final infringement contentions do not "identify additional accused products or processes not set out in the Preliminary Infringement Contentions," so no amendment or further explanation is necessary. See SPR 7.1(a)(2).

handgun's support structure is "removably insertable" in the passage of the PCB without significant alteration. Moreover, Sig Sauer fails in each of its attempts to undermine NST's evidence on this matter. Accordingly, I deny Sig Sauer's motion for summary judgment on this ground.

## B.    "Telescopically Receivable"—Doctrine of Equivalents

Sig Sauer next argues that NST forfeited its right to assert that the "telescopically receivable" claim limitation has been met under the doctrine of equivalents because it failed to disclose its theory in the manner required by the court's local rules.

This district's SPRs require a party claiming infringement to serve both "Preliminary Infringement Contentions," SPR 5.1(a), and "Final Infringement Contentions," SPR 7.1(a). Preliminary infringement contentions must "include an infringement claim chart for each accused product." SPR 5.1(a). That claim chart must disclose, among other things, "[w]hether each limitation of each asserted claim is alleged to be literally present or present under the doctrine of equivalents in the Accused Instrumentality." SPR 5.1(a)(1)(D). Additionally, no more than twenty-one days after the court issues its claim construction order, "any party asserting infringement must serve on all parties its 'Final Infringement Contentions,' which shall include the party's final statement of all contentions required by SPR 5.1(a)." SPR 7.1(a)(1). Thus, the local rules require a party claiming infringement to state

whether a claim limitation is met under the doctrine of equivalents in both its preliminary infringement contentions and final infringement contentions.

NST served timely preliminary[6] and final infringement contentions in accordance with the SPRs, but its disclosures made no mention of the doctrine of equivalents. After NST made its final infringement contentions and Sig Sauer its final invalidity contentions, the parties submitted a joint proposed discovery plan (which I later approved) that authorized NST to serve a second set of final infringement contentions after the completion of discovery. Doc. 109.

NST served its revised final infringement contentions on Sig Sauer pursuant to that approved plan on February 20, 2025. Doc. 114-8 at 8. It was in those revised final infringement contentions that NST first mentioned the doctrine of equivalents by stating as follows:

> To the extent any element of the Claims-in-Suit are not literally met, NST contends that such element is satisfied under the doctrine of equivalents. Specifically, the Accused Products perform substantially the same function, in substantially the same way, to achieve substantially the same result as required by the claim elements of the support structure being telescopically receivable in the passage. For example, the support structure of the Accused Product is telescopically receivable in the passage of the body of

---

[6]    The docket does not contain a record of NST's preliminary infringement contentions, but neither party has challenged the timeliness or substantive adequacy of those contentions. Accordingly, for the purpose of this analysis, we assume NST's preliminary infringement contentions were timely.

> the forearm-gripping stabilizing attachment equivalent to that of a support structure that is removably insertable.

Id. at 3-4.

Sig Sauer focuses its challenge to NST's revised final infringement contentions on the content of those disclosures rather than their timing.[7] In its view, NST's attempt to invoke the doctrine of equivalents is insufficient because it is nothing more than a conclusory statement that the doctrine applies without explaining "why and how" the claim element has been met under the doctrine. Doc. 114-1 at 25. Although SPR 5.1(a)(1)(D) does not expressly require a more detailed disclosure, I agree with other districts that more than a conclusory statement regarding the doctrine of equivalents is required.

In other districts that have adopted nearly identical local rules regarding the doctrine of equivalents to those of this court, "a general reservation of the right to assert infringement under the doctrine of equivalents does not satisfy a plaintiff's obligation to disclose its infringement

---

[7]   To the extent that Sig Sauer argues that the disclosures were also untimely, I decline to address its argument because it has not been sufficiently developed. Nor do I address any possible argument based on the adequacy of NST's expert disclosures because that argument too has not been sufficiently developed.

26

analysis as required by [the local patent rules]." DNA Genotek Inc. v. Spectrum Sols, L.L.C., 671 F. Supp. 3d 1105, 1125 (S.D. Cal. 2023). Instead, such courts say that compliance with the local rules requires a patentee to "provide 'a limitation-by-limitation' analysis as to why and how there is infringement under the doctrine of equivalents." Id. (citing Bell Semiconductor, LLC v. NXP USA, Inc., 2023 WL 2342037, at *7 (S.D. Cal. Feb. 27, 2023); see also ASUS Comput. Int'l v. Round Rock Rsch., LLC, 2014 WL 1463609, at *3 (N.D. Cal. Apr. 11, 2014) (holding that "blanket contentions that do not sufficiently identify the DOE as the manner that the products infringe" do not sufficiently to satisfy the local rule). NST's revised final infringement contentions fail to describe why and how there is infringement under the doctrine of equivalents, and I therefore find they do not satisfy SPR 5.1(a)(1)(D).

I am not convinced, however, that preclusion is the appropriate remedy here. It is true that our local rules bar a party claiming infringement from "assert[ing] at trial any infringement contentions not set out in its Final Infringement Contentions," SPR 7.1(a)(1). However, our local rules also allow me to "excuse a failure to comply with any local rule whenever justice so requires." LR 1.3(b). This rule permits courts to conduct a more nuanced analysis into whether a party's failure to comply with a local rule should result in preclusion. Given that SPR 5.1(a)(1)(D) does not expressly require a

more detailed disclosure of a doctrine of equivalents theory and case law in our district is silent as to the substantive requirements of that rule, I believe that a more nuanced analysis as to why NST failed to comply with the local rules is warranted here.

Federal Rule of Civil Procedure 37(c), which discusses appropriate sanctions for parties who fail to make mandatory disclosures during discovery, provides a useful analogue in assessing NST's failure to disclose its doctrine of equivalents theory pursuant to SPR 5.1 and 7.1. See Fed. R. Civ. P. 37(c). Accordingly, I assess the present circumstances under its standards. Under Rule 37(c), "[i]f a party fails to provide information or identify a witness as required by [Rules] 26(a) or (e), the party is not allowed to use that information . . . to supply evidence . . . at trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c) (emphasis added). Thus, while Rule 37 sets preclusion as the "baseline sanction" for failure to disclose, preclusion is not "'strictly required,' and the district court retains discretion to impose a less severe sanction." G.K. v. Sununu, 2024 DNH 050, 2024 WL 3011178, at *4 (D.N.H. June 14, 2024) (citing Lawes v. CSA Architects & Eng'rs LLP, 963 F.3d 72, 91 (1st Cir. 2020)).

Here, the parties have not addressed in detail whether NST's failure to disclose its doctrine of equivalents theory was substantially justified or harmless. NST provides no explanation for its failure to disclose why and how

28

there is infringement under doctrine of equivalents, and Sig Sauer, in turn, has not shown how it has been harmed by NST's insufficient disclosure. Until the parties brief this issue in more detail, therefore, I am unable to determine the appropriate sanction for NST's failure to comply with SPR 5.1(a)(1)(D) and 7.1.[8]

## C.    "A Body" That Is "Bifurcated"

The '444 Patent requires "a body having . . . a lower portion . . . said lower portion being bifurcated so as to define a pair of spaced flaps." '444 Patent col. 5 ll. 65-67, col. 6 ll. 1-2. In my claim-construction order, I interpreted two phrases contained within the above limitation. First, I determined that "body" must be accorded its "plain and ordinary meaning." Doc. 106 at 32. I rejected Sig Sauer's proposed construction of the term "body" to require a "unitary" component and instead agreed with NST that the body can be "comprised of multiple components." Id. at 30-31 ("Neither of these

---

[8]    Sig Sauer also challenges the substance of NST's doctrine of equivalents theory. It argues that even if the Court permits NST to assert the doctrine of equivalents as to "telescopically receivable," any use of the doctrine would "vitiate the claim language" in question here. Doc. 114-1 at 21-22. It argues that the PCB "can only be disassembled with tools and then dismantled for the purposes of discarding a primary portion of the device," which, it contends, is "the polar opposite of the removably insertable brace of the Patents-in-Suit." Id. at 26. However, because Sig Sauer's claim-vitiation argument is premised on material facts in dispute—namely, that removing the PCB's brace flaps requires "destructive dismantling" and "discarding" the device—this argument likewise fails at summary judgment.

29

definitions, however, require that the body be comprised of just one component."). Second, I construed "bifurcated so as to define a pair of spaced flaps" to mean "divided or separated so as to define a pair of spaced flaps." Id. at 33.

In its revised final infringement contentions, NST argues the accused products meet the "bifurcated" "body" limitation described in the '444 Patent. It contends that the two images below, one diagram of an accused product and one photograph of an accused product, show a "lower portion (H) [of the body] being bifurcated so as to define a pair of spaced flaps (K) between which a user's forearm is received when securing the stabilizing attachment (A) to the user's forearm." Doc. 114-8 at 13.





Id.

In response to these contentions, Sig Sauer moves for summary judgment on the ground that NST cannot prove that the accused products have a "body" whose lower portion [is] "divided or separated so as to define a pair of spaced flaps." See Doc. 106 at 39. It argues that because the accused product has "[t]wo separate bodies, each consisting of its own flap," those two flaps are not "a body" that is bifurcated; instead, it argues that "the body still has to be singular in some aspect such that two flaps can form branches from what was one part." Doc. 114-1 at 27.

The first component of Sig Sauer's argument is that the claim limitation envisions "a body" in the singular, rather than the plural. Sig Sauer cites TiVo, Inc. v. EchoStar Communications Corporation in support of this argument. See 516 F.3d 1290 (Fed. Cir. 2008). TiVo held that although the words "a" or "an" in a patent claim generally mean "one or more," that "rule does not apply when . . . the claims and written description . . . make

31

Case 1:19-cv-00792-PB    Document 129    Filed 05/05/26    Page 32 of 35

clear that the singular meaning applies." Id. at 1303. Sig Sauer argues that, as in TiVo, the present claims as construed "require 'branching' from 'a' body," such that when read in context, those claims "can only mean from one part to two." Doc. 114-1 at 29. Because the PCB's body "is already comprised of two separate parts," Sig Sauer contends, there is no "bifurcation to two flaps because they already consist of two completely separate parts." Id.

In response, NST argues that a triable issue of fact exists over whether an PCB's two brace flaps constitute "a 'body'" that is "separated or divided as to define a pair of spaced flaps." Doc. 115 at 29-30. It contends that Sig Sauer's argument on this point both ignores my claim-construction order and misapplies TiVo to the present case. NST argues that because my claim construction order determined that "the body can be comprised of multiple components attached together so as to form a unitary body," Sig Sauer's argument that the accused products have more than one body, rather than "a body," fails. Id. at 30 (citing Doc. 106 at 30 n.5). It also contends that "[i]f any analogies can be drawn [between TiVo and this case], reading two (2) separate components can be combined and considered unitary is consistent with a finding under the Court's construction of 'a body' and that the Accused Products' brace flap portions meet that limitation." Id.

I conclude that NST has raised a triable issue of fact over whether the accused products have "a body" whose lower portion is "divided or separated

32

so as to define a pair of spaced flaps." To start, my claim-construction order

expressly determined that a body can be "comprised of multiple components,"

Doc. 106 at 30, and Sig Sauer's argument that two separate flaps cannot

constitute a single body thus necessarily fails. Just as "the body of a car is

generally . . . manufactured in separate pieces . . . and assembled into a

single structure," id. at 31, a reasonable juror could find that the two

separate brace flaps here, when assembled and held together at their upper

portions using a hex bolt and thumb screw, form a single structure and thus

constitute a single "body."

Moreover, Sig Sauer's arguments about TiVo simply do not apply to the

PCB. TiVo does hold that "the question whether 'a' or 'an' is treated as a

singular or plural depends heavily on the context of its use" and the "general

rule does not apply when the context clearly evidences that the usage is

limited to the singular." 516 F.3d at 1303. I also agree with Sig Sauer's

argument that "a body" could be understood as singular in the current claim.

However, Sig Sauer strains logic when it argues that "[t]wo separate bodies,

each consisting of its own flap, is not bifurcation." Doc. 114-1 at 27. Although

I agree that "a body" here is used in the singular, that does not mean there is

no bifurcation simply because the body is comprised of two separate pieces

joined together. On the contrary, a reasonable juror could find that the body

is composed of two flaps that "divide or separate so as to define a pair of

33

spaced flaps" when they are axially rotated from their connected upper portion.

This claim limitation must be assessed in two separate steps: (1) is there "a body" in the accused products; and (2) if so, does that body's lower portion "divide or separate so as to define a pair of spaced flaps"? On the first question, I already determined that "a body" could consist of more than one piece, and thus a reasonable juror could find that the two brace flaps, when assembled together in a PCB, constitute "a body." On the second question, a reasonable juror could also find that when that the "body" hinges open, the lower portion of the body "divide[s] or separate[s] so as to define a pair of spaced flaps." NST contends that the "upper portion" of the body is the portion of the PCB where the two flaps are joined together to form a "passage," whereas the "lower portion" of the body consists of the rotatable portions of the brace flaps that are "bifurcated" to receive a user's forearm. Doc. 115-8 at 33. Under this construction, a reasonable juror could find that both parts of the claim limitation are satisfied by the PCB. Therefore, I conclude that NST presents a triable issue of fact over whether the PCB has a "body" that's lower portion is "bifurcated so as to define a pair of spaced flaps."

34

## IV.  <u>CONCLUSION</u>

Based on the foregoing, I determine that NST raises genuine issues of material fact as to literal infringement on the "telescopically receivable" and "bifurcated" "body" claim limitations of the Patents. Moreover, although I find that NST has not substantively complied with SPR 5.1 and 7.1 in disclosing its doctrine of equivalents theory, I cannot determine at present whether preclusion is the appropriate sanction, nor can I grant summary judgment on this claim. Accordingly, I deny Sig Sauer's motion for summary judgment as to infringement of the "telescopically receivable" claim limitation, both literally and under the doctrine of equivalents, and literal infringement of the "bifurcated" "body" claim limitation. Doc. 114.

SO ORDERED.

<u>/s/ Paul J. Barbadoro</u>
Paul J. Barbadoro
United States District Judge

May 5, 2026

cc:    Counsel of Record

35